In the Matter of the Estate of EDWIN I. JOHNSON, Deceased. ROBERT ABRAMS, as Attorney-General of the State of New York, Appellant; JONATHAN G. BLATTMACHR, Respondent.

Second Department, March 21, 1983

## APPEARANCES OF COUNSEL

*Robert Abrams, Attorney-General* (*Shirley Adelson Siegel, Deborah Bachrach* and *Lawrence S. Kahn* of counsel), appellant *pro se*.

*Jonathan G. Blattmachr* (*Milbank, Tweed, Hadley & McCloy* [*Linden Havemeyer Wise*] of counsel), guardian ad litem for unknown males who are prospective scholarship recipients under the will of Edwin Irving Johnson, respondent *pro se*.

*Wirth H. Koenig, c/o Greenbaum, Wolff & Ernst,* guardian ad litem for unknown distributees under the will of Edwin Irving Johnson.

*Abigail A. Jones, Lenore W. Tucker, Phyllis N. Segal* and *Anne E. Simon,* for New York State National Organization for Women and Advocates for Children, *amici curiae*.

## OPINION OF THE COURT

MOLLEN, P. J.

The issue presented on this appeal is whether the equal protection clause of the Fourteenth Amendment is violated when a Surrogate reforms the provisions of a will so as to give effect to a testamentary bequest which discriminates on the basis of sex.

In 1978 Edwin Irving Johnson died. His will created a gender-restricted scholarship fund to be administered by the Croton-Harmon Union Free School District for the benefit of its needy and deserving male high school graduates. The school district declined to award the scholar-

ships on a gender-restricted basis, proposing instead to make the selections without regard to sex. In a proceeding to construe the will so as to permit gender-neutral scholarship awards, the Surrogate refused to delete the sex restriction. Instead, he decreed that the school district be replaced by a private trustee who was willing and able to administer the fund and award the scholarships as directed in the will (108 Misc 2d 1066). The appellant and *amici curiae* now contend that the Surrogate's decree, which clears the way for scholarships to be awarded on a discriminatory basis, is both inconsistent with a proper application of the doctrine of cy pres and violative of the constitutional guarantee of equal protection of the law.

We turn first to a brief review of the pertinent facts.

On June 30, 1961, Mr. Johnson executed a will which bequeathed his residuary estate to Columbia University in trust. The income of the trust was to be paid first to his sister-in-law and, upon her death, to the trustees of Columbia University. The trustees were to apply the income to scholarships for young men from the Croton-Harmon Union Free School District who were attending Columbia. A further provision of the will directed that, if continuation of the Columbia scholarship fund became impractical, the corpus of the trust would be divided equally between the university and the school district for scholarship purposes. A subsequent will, dated December 4, 1974, contained identical provisions regarding the creation of a scholarship fund at Columbia University.

At one point, the university expressed dissatisfaction with that portion of the bequest limiting the class of beneficiaries to those of its students who had graduated from the high school of the Croton-Harmon school district. When the university asked that the restriction be modified, Mr. Johnson's attorney replied that his client's interest in the school district was greater than his interest in Columbia.

The will here in issue, Mr. Johnson's last, was executed on December 15, 1975. The bequest to Columbia University was deleted and replaced with a provision bequeathing the residuary estate to the Croton-Harmon school district with a direction that the district apply the funds for schol-

arships to needy college-bound graduates without regard to the university to be attended. Again, however, the will contained a gender restriction, providing that the scholarships were to be granted to "deserving young men". The specific provision was as follows: "SIXTH: I give, devise and bequeath my entire residuary estate to CROTON-HARMON UNION FREE SCHOOL DISTRICT, the principal of which shall be invested and held for the purposes hereof, and the net income of which shall be used and applied, each year to the extent available, for scholarships or grants for bright and deserving young men who have graduated from the High School of such School District, and whose parents are financially unable to send them to college, and who shall be selected by the Board of Education of such School District with the assistance of the Principal of such High School."

Mr. Johnson died on January 10, 1978, and his will was admitted to probate four months later. Pursuant to article SIXTH, his executrix made distributions to the Croton-Harmon Union Free School District of $195,000, representing the entire residuary estate. In April, 1979, the district's board of education announced that the Edwin Irving Johnson scholarships were to be awarded and that applications would be accepted from graduating male students on or before May 1, 1979.

Although only male applicants were solicited, at least one female student applied for a scholarship, and threatened to seek Federal injunctive relief if she were denied consideration on account of her sex. In addition, the National Organization for Women Legal Defense and Education Fund contacted the Civil Rights Office of the Department of Health, Education and Welfare (HEW), and alleged that, in proposing to award gender-restricted scholarships, the school district was acting in violation of title IX of the Education Amendments of 1972 (US Code, tit 20, § 1681, subd [a] et seq.). As a result of this communication, HEW commenced an investigation to determine whether the school district was engaged in discrimination on the basis of sex.

Thereafter, the school district decided to defer awarding the scholarships and entered into a stipulation with the

executrix of the will and with the Attorney-General of the State of New York by which they agreed "to the deletion of the word 'men' in Article Sixth of the Will and the insertion of the word 'persons' in its place". On June 11, 1979, the Attorney-General commenced this proceeding to have the Surrogate construe article SIXTH of the Johnson will as agreed in the stipulation. The purpose of such a construction, the Attorney-General asserted, was "to permit the educational bequest set forth [therein] to be administered in accordance with the testator's general charitable intent without violation of the United States Constitution, the Constitution of the State of New York, Federal Law and the public policy as reflected in [those] provisions prohibiting discrimination based on sex."[1]

The Surrogate first appointed a guardian ad litem to represent Mr. Johnson's unknown distributees. The guardian submitted a report in which he offered no opposition to the proposed construction. His position was that, as there probably were no surviving distributees who might qualify to take in intestacy, "the decedent would prefer that scholarships be provided to girls as well as boys, if the alternative * * * would be to have his residuary estate pass as intestate property" and thereby escheat to the State. After receiving this report, the Surrogate appointed a second guardian ad litem — this one to represent prospective male scholarship recipients under the will as written. The second guardian submitted a report in which he opposed the stipulated construction. He maintained that "the appropriate remedy is for the Court to apply the cy pres doctrine to appoint a new administrator for the scholarship fund which is not an instrumentality of the State."

The Surrogate, finding (108 Misc 2d 1066, 1070, *supra*) the establishment of a gender-restricted scholarship fund "neither illegal nor against public policy", directed that the school district, which had refused to administer the discriminatory trust, be replaced by a private trustee who would comply with the provisions of the will. Although the selection of scholarship recipients was to be the independent responsibility of the private trustee, the Surrogate

---

1. Upon receiving the school district's assurance that no scholarships would be awarded pending the Surrogate's determination, HEW terminated its investigation.

directed (p 1073) that the trustee "may consider any recommendations that may be made to it by the Board of Education of the Croton-Harmon Union Free School District or principal of the high school".

It is from the intermediate decree, entered upon the Surrogate's decision, that the Attorney-General now appeals. The decree should be reversed.

The bequest here in issue, which sought to provide higher education for those who could not otherwise afford it, created a charitable trust. It has long been recognized that "[c]harity ministers to the mind as well as to the body" and, accordingly, "[i]t is established law in this state that a gift for the promotion of education or learning is a gift for charitable uses" (*Butterworth v Keeler,* 219 NY 446, 449, 450 [CARDOZO, J.]; see, also, EPTL 8-1.1, subd [a]; 4 Scott, Trusts [3d ed], § 370). Moreover, the trust here does not lose its charitable character because its beneficiaries are limited to males (see 4 Scott, Trusts [3d ed], § 370.6; Restatement, Trusts 2d, § 370, Comment [*j*]). A charitable trust may be restrictive, provided only that the class of beneficiaries is sufficiently large so that the public is interested in the enforcement of the trust (4 Scott, Trusts [3d ed], § 369.5).

Although charitable in nature, however, the trust Mr. Johnson created was clearly vulnerable to an equal protection challenge. By naming the Croton-Harmon Union Free School District, a public agency, as trustee to receive, invest, administer and dispense scholarship funds and to select scholarship recipients, the bequest required substantial State involvement, thereby triggering the guarantees of the Fourteenth Amendment (see, e.g., *Pennsylvania v Board of Trusts,* 353 US 230; *Wachovia Bank & Trust Co. v Buchanan,* 346 F Supp 665, affd 487 F2d 1214; *Matter of Crichfield Trust,* 177 NJ Super 258, 261; cf. *Shapiro v Columbia Union Nat. Bank & Trust Co.,* 576 SW2d 310 [Mo]).[2] Those guarantees would plainly be violated by the award of scholarships pursuant to the bequest's sex-based discriminatory restriction because such restriction had no substantial relation to the goal of promoting higher educa-

---

2. Indeed, in his report to the Surrogate, the guardian for prospective male scholarship recipients conceded as much.

tion (see *Kirchberg v Feenstra,* 450 US 455; *Califano v Westcott,* 443 US 76; *Craig v Boren,* 429 US 190; *Stanton v Stanton,* 421 US 7; *Reed v Reed,* 404 US 71; *People v Whidden,* 51 NY2d 457). As the Supreme Court itself has observed, "[c]oeducation is a fact, not a rarity" (*Stanton v Stanton,* supra, p 15). Thus, as written, Mr. Johnson's bequest was fatally flawed, for an agency of the State cannot constitutionally administer a scholarship program which discriminates on the basis of sex (see *Matter of Crichfield Trust, supra*).

When the Attorney-General petitioned for the construction of the will, therefore, the Surrogate was presented, not merely with an unremarkable situation in which a trustee is unwilling or unable to perform, but with a testamentary trust which by its terms was constitutionally infirm. The Surrogate undertook to remove the infirmity, and the questions presented here concern whether he should have undertaken that task and, if so, whether the course he chose was appropriate and proper.

A charitable trust which is impossible to perform need not fail if the evidence demonstrates that the settlor had a general charitable intent. Where such an intent is shown, the court may reform the trust to permit it to be performed in a way that is as consistent as possible with the settlor's original intent (see, e.g., *Sherman v Richmond Hose Co. No. 2,* 230 NY 462, 473; EPTL 8-1.1, subd [c]). In our view, the evidence before the Surrogate amply demonstrated that Mr. Johnson had a general charitable intent.

From 1961 onward he made substantial provision in his wills for educational scholarships, first for graduates of the Croton-Harmon school district's high school attending Columbia University, then for the district's graduates regardless of which college they planned to attend. Significantly, in his 1961 and 1974 wills, Mr. Johnson directed that, if the trust became impractical to administer, the corpus was to be divided equally between Columbia and the school district to permit them to continue awarding scholarships as they saw fit. His last will contained no reverter or gift-over clause. Thus, Mr. Johnson has never made provision for the scholarship funds to be applied to any noncharitable purpose in the event the trust as written

proved impossible to perform. The absence of such an alternative disposition is generally taken as substantial evidence of a general charitable intent (see *Matter of Syracuse Univ. [Hendricks]*, 1 Misc 2d 904, 912-913, affd 3 AD2d 890, affd 4 NY2d 744; *Matter of Lawless*, 194 Misc 844, 855, affd 277 App Div 1045; Bogert, Trusts and Trustees [2d ed, rev], § 437; 4 Scott, Trusts [3d ed], § 399.2; see, also, *Matter of Fletcher*, 280 NY 86, 91). Additionally, whereas the trust here was impossible to perform because of the combination of the identity of the trustee and the restriction placed on the class of beneficiaries, there is no evidence to suggest that either factor was an essential or indispensable element of Mr. Johnson's desire to create a scholarship fund. There is no indication, therefore, that a modification of either factor would do violence to Mr. Johnson's fundamental intent (cf. *Evans v Abney*, 396 US 435; *Matter of Syracuse Univ. [Heffron]*, 3 NY2d 665). Indeed, the guardian for unknown distributees asserted that his examination of the will and its predecessors led him to conclude that Mr. Johnson would have preferred the removal of the gender restriction to the failure of the trust.

Accordingly, we conclude that the Surrogate was correct in determining that it was appropriate to reform the trust. We turn, then, to the question of whether the reformation he made was proper.

The Surrogate was presented with two options for removing the obstacle to the performance of the trust. The Attorney-General, supported by the executrix and the school district and unopposed by the guardian for unknown distributees, asked that the gender restriction on the class of beneficiaries be deleted. The guardian for prospective male scholarship recipients asked, in effect, that the school district be replaced as trustee by a person or entity not connected with the State (see SCPA 1502). The Surrogate chose the latter course finding, as do the distinguished dissenters in this court, that Mr. Johnson's primary and unambiguously expressed intent was to provide scholarships only for "bright and deserving young men", and that that purpose was more important to him than having the district serve as trustee. Concededly, this position may be viewed as consistent with the general rule that the identity

of the beneficiary is presumed to be more important to the settlor than the identity of the trustee (see Bogert, Trusts and Trustees [2d ed, rev], § 328). Nevertheless, our review of the record persuades us that it was at least as important to Mr. Johnson that the school district act as trustee as that the scholarships be awarded on a discriminatory basis. Moreover, we conclude that, whatever Mr. Johnson's primary intent, the Surrogate's decree cannot stand because it offends the equal protection clause of the Fourteenth Amendment.

In supporting the Surrogate's determination upholding the gender restriction, the dissenters place heavy reliance upon the right of every individual to dispose of his property as he sees fit. It is indeed fundamental that one may dispose of his property to selective beneficiaries such as a favored religious institution, a fraternal organization, or a group which performs good work for limited segments of society. And the right, of course, is not necessarily limited to the disposition of property to groups or causes which society views as worthy. The right to dispose of property may be exercised as well in a manner that indulges one's own personal bigotry and irrational prejudices. Private discrimination, no matter how egregious, distasteful, or morally reprehensible, is not constitutionally proscribed (see, e.g., *Adickes v Kress & Co.,* 398 US 144, 169; *Shelley v Kraemer,* 334 US 1, 13).

Nevertheless, it is both the genius and the strength of our system that rights, no matter how important, are rarely, if ever, absolute (see *Schermerhorn v Rosenberg,* 73 AD2d 276, 283). So it is with the right to freely dispose of one's property. It has long been settled, for example, that our courts will not give effect to a testamentary disposition designed to carry out some immoral or illegal purpose (see, e.g., *Matter of Hughes,* 225 App Div 29, 30-31, affd 251 NY 529; 4 Scott, Trusts [3d ed], § 377; Restatement, Trusts 2d, § 377). Similarly, and as relevant here, the right to dispose of property in an invidiously discriminatory fashion may not be exercised in a way that enlists the substantial participation of the State or its agents in the accomplishment of the discriminatory purpose (see, e.g., *Jackson v Statler Foundation,* 496 F2d 623, 633-634, cert den 420 US

927; see, also, *Evans v Newton*, 382 US 296, 298). "Government is the social organ to which all in our society look for the promotion of liberty, justice, fair and equal treatment, and the setting of worthy norms and goals for social conduct. Therefore something is uniquely amiss in a society where the government, the authoritative oracle of community values, involves itself in * * * discrimination." (*Adickes v Kress & Co.*, 398 US 144, 190-191, *supra* [BRENNAN, J., concurring in part and dissenting in part].)

Thus, the constitutional guarantee of equal protection of the law comes forcefully into play whenever State action fosters or encourages invidious discrimination (see, e.g., *Moose Lodge No. 107 v Irvis*, 407 US 163, 173, 176-177). Nevertheless, in the absence of obvious government involvement in discrimination, it is often difficult to determine whether the State's connection with the challenged conduct is sufficiently substantial to amount to State action within the contemplation of the Fourteenth Amendment (see *Moose Lodge No. 107 v Irvis, supra,* p 172).

The Supreme Court has never accomplished the virtually impossible task of formulating a comprehensive definition of State action (see *Reitman v Mulkey*, 387 US 369, 378; *Kotch v Pilot Comrs.*, 330 US 552, 556). Instead, the court, on an essentially *ad hoc* basis, has looked to different factors, depending largely upon the context in which the constitutional claim arises. In some instances, the court has focused simply on whether there is a close nexus between the actions of the State and the challenged conduct (see, e.g., *Jackson v Metropolitan Edison Co.*, 419 US 345). In other cases the court has relied on indications of a symbiotic relationship between the State and the individual charged with invidious discrimination (see, e.g., *Burton v Wilmington Parking Auth.*, 365 US 715). On occasion, the court has pointed to joint activity by the actor and State agents (see, e.g., *Flagg Bros. v Brooks*, 436 US 149). Still elsewhere, the court has found State action where private discriminatory activity is undertaken under compulsion of some State enforced custom (see, e.g., *Adickes v Kress & Co., supra*). And, in another context, the court has found State action where a private entity performs a public function which is traditionally the exclusive prerogative of

the State (see, e.g., *Marsh v Alabama,* 326 US 501). On the other hand, the fact that a private entity receives some public funds or enjoys a tax exemption is not generally regarded as sufficient to trigger the guarantees of the equal protection clause (see, e.g., *Rendell-Baker v Kohn,* 457 US 830; see, also, *Dorsey v Stuyvesant Town Corp.,* 299 NY 512). Nor does State action necessarily exist solely because a private entity is subject to State regulation (see, e.g., *Blum v Yaretsky,* 457 US 991; *Jackson v Metropolitan Edison Co., supra*).

The rule emerging from the long course of constitutional litigation is that State action will be found where the court, "by sifting facts and weighing circumstances" (*Burton v Wilmington Parking Auth.,* 365 US 715, 722, *supra*), determines that "the conduct allegedly causing the deprivation of a federal right [is] fairly attributable to the state" (*Lugar v Edmondson Oil Co.,* 457 US 922, __, 102 S Ct 2744, 2754). And, "where the impetus for the discrimination is private, the State must have 'significantly involved itself with invidious discriminations' * * * in order for the discriminatory action to fall within the ambit of the constitutional prohibition" (*Moose Lodge No. 107 v Irvis,* 407 US 163, 173, *supra;* see, also, *Sharrock v Dell Buick-Cadillac,* 45 NY2d 152, 158).

Beyond this, however, there are well-settled principles which obtain in equal protection cases and which are particularly helpful to our analysis of the issues at bar. The very earliest cases in the area recognized that, for the purposes of the Fourteenth Amendment, State action may be found in the conduct of the State's judicial authorities (see, e.g., *Virginia v Rives,* 100 US 313, 318; *Ex parte Virginia,* 100 US 339, 347; *Civil Rights Cases,* 109 US 3, 11; *Twining v New Jersey,* 211 US 78, 91; *Brinkerhoff-Faris Co. v Hill,* 281 US 673, 680). Thus, under the principle that the Constitution is violated when the State "enforces privately originated discrimination" (*Moose Lodge No. 107 v Irvis,* 407 US 163, 172, *supra;* see, also, *Griffin v Maryland,* 378 US 130, 136), the Supreme Court has found unconstitutional State action where the State's judiciary is called upon to enforce a private and invidiously discriminatory covenant (*Shelley v Kraemer,* 334 US 1, *supra*) or to

award damages for its breach (*Barrows v Jackson,* 346 US 249). As the court has observed, "[t]he Constitution confers upon no individual the right to demand action by the State which results in the denial of equal protection of the laws to other individuals" (*Shelley v Kraemer, supra,* p 22).

It is these principles which must govern the disposition of the case at hand.

As previously indicated, we do not view the circumstances here as akin to those in which a named trustee, through death, illness or disinclination, becomes unable to perform his responsibilities. The Croton-Harmon school district, as an agency of the State, was unable to carry out its duties under the bequest because it was constitutionally prohibited from doing so. Accordingly, there was more here than the simple performance by a Surrogate of the relatively neutral function of substituting one trustee for another (see SCPA 1502).

The Surrogate was asked, not only by the Attorney-General of the State, but impliedly by the named trustee and by Mr. Johnson's executrix, to delete the gender restriction in order to preserve the trust. Acting essentially *sua sponte,* however, the Surrogate, in an effort to adhere to what he believed to be Mr. Johnson's primary intent, decided instead to remove the district as trustee and to direct that a private trustee be substituted to administer the scholarship fund on the discriminatory basis set forth in the will. Significantly, under the Surrogate's decision, the private trustee, without being bound by the strictures of the Fourteenth Amendment, would remain free to receive what might well prove to be decisive recommendations from the school district. The decree, therefore, accomplished indirectly what could not be accomplished directly, viz., the selection of scholarship recipients by the school district on a gender-restricted basis. Acting in the capacity of a State judicial officer, the Surrogate issued a decree which enforced privately originated discrimination by removing the constitutional obstacle that prevented it. This, in our view, was inconsistent with the purposes and principles of the Fourteenth Amendment (see, e.g., *Matter of Crichfield Trust,* 177 NJ Super 258, 262, *supra*).

Instructive on this point is the celebrated litigation surrounding the will of Stephen Girard, a wealthy resident of Philadelphia who died in 1831. The will left in trust a considerable sum to the City of Philadelphia, and to its Mayor and aldermen to be used, *inter alia,* for the purpose of establishing an educational institution for the training and maintenance of "poor white male orphans". The trust was administered by various city agencies until 1869 when, by State law, a local board of trusts was established to oversee and administer the institution. In 1954, two otherwise qualified black children applied for admission to the institution and were refused under constraint of the bequest's racial restriction. Their subsequent court challenge reached the Supreme Court which held that, since the board of trusts was a State agency, its refusal to admit the children because of their race was unconstitutional discrimination by the State. The court remanded the cause for further proceedings (see *Pennsylvania v Board of Trusts,* 353 US 230, *supra*).

On remand, the Pennsylvania Supreme Court simply remitted the matter to the Orphans' Court of Philadelphia which promptly replaced the board of trusts with a private trustee to administer the institution on the racially restricted basis prescribed in the will. On the appeal that followed, the Pennsylvania Supreme Court upheld the substitution of trustees (*Matter of Girard Coll. Trusteeship,* 391 Pa 434, cert den *sub nom. Pennsylvania v Board of Trusts,* 357 US 570). The court saw the issue largely as concerning "the right of a private individual to bequeath his property for a lawful charitable use and have his testamentary disposition judicially respected and enforced" (391 Pa, at p 441). The court distinguished *Shelley v Kraemer* (334 US 1, *supra*) and *Barrows v Jackson* (346 US 249, *supra*) on the ground that the black applicants to the Girard institution had not been deprived of any constitutionally guaranteed right since they had no right in the first instance to be beneficiaries under the will.[3] Finally,

---

3. We note that the dissenters in this court advance an identical argument, observing that " 'bright and deserving young women' * * * had no constitutional or statutory right to share in Mr. Johnson's estate" and that they had "no constitutional or statutory right to have compelled [him] to include them in his will."

the court concluded that the substitution of trustees was entirely appropriate as it would be in any case in which the named trustee could no longer serve.

Following the rejection of their challenge in the Pennsylvania Supreme Court, the black children instituted a Federal class action. The District Court sustained their constitutional claim largely on the basis of the "momentum" created by the long-standing direct connection between the Girard institution and the State (*Commonwealth of Pennsylvania v Brown,* 270 F Supp 782). The court held that (p 790) "the transfer of immediate supervisory control to private trustees by the Orphans' Court failed to effectively disassociate the State from the discriminatory policies and purposes which the State operation of the school had come to embody."

On appeal, the Third Circuit Court of Appeals unanimously affirmed (*Commonwealth of Pennsylvania v Brown,* 392 F2d 120, cert den 391 US 921). While agreeing with the District Court's finding regarding "momentum", the Court of Appeals went further in condemning the substitution of trustees. The court found *Shelley v Kraemer (supra)* to be applicable, and held that (p 125) State involvement was "the obvious net consequence of the displacement of the City Board by the Commonwealth's agent and the filling of the Girard Trusteeships with persons selected by the Commonwealth and committed to upholding the letter of the will." The court continued (p 125):

"Those radical changes pushed the College right back into its old and ugly unconstitutional position * * *

"We do not consider the move of the state court in disposing of the City Trustees and installing its own appointees to be a non obvious involvement of the State * * * The action in this instance and its motivation are to put it mildly, conspicuous. And what happened to Girard does '* * * significantly encourage and involve the State in private discriminations.' "

Moreover, of the five Circuit Judges who heard the case, two concurred separately in the result, each specifically expressing the view that affirmance would be warranted

solely because the Orphans' Court's *sua sponte* substitution of trustees was itself unconstitutional State action (KALODNER, J., concurring, pp 125-127; VAN DUSEN, J., concurring, pp 127-128; see, also, *Wachovia Bank & Trust Co. v Buchanan,* 346 F Supp 665, 667-668, affd 487 F2d 1214, *supra*).

In the case at bar, we reach a similar conclusion. In doing so, however, we take care to note that we are not holding that the largely ministerial and neutral judicial acts of merely admitting to probate a will containing a discriminatory bequest, or of substituting one private trustee for another to administer a discriminatory testamentary trust, constitute State action for the purposes of the Fourteenth Amendment (see *Gordon v Gordon,* 332 Mass 197, cert den 349 US 947; *United States Bank of Portland v Snodgrass,* 202 Ore 530; *Matter of Potter,* 275 A2d 574, 580 [Del]). Nor do we hold that the act of a court in upholding the discriminatory provisions of a purely private trust against an outside challenge involves the State in unconstitutional discrimination (see, e.g., *Lockwood v Killian,* 172 Conn 496).

We hold only that, presented with an invidiously discriminatory charitable trust which could not be constitutionally performed, the Surrogate was precluded by the Fourteenth Amendment from actively intervening to reform the trust in a way that had the "immediate objective" and "ultimate effect" of enforcing its discriminatory provision (*Reitman v Mulkey,* 387 US 369, 373, *supra;* see *Shelley v Kraemer,* 334 US 1, *supra; Barrows v Jackson,* 346 US 249, *supra; Commonwealth of Pennsylvania v Brown,* 392 F2d 120, cert den 391 US 921, *supra; Matter of Crichfield Trust,* 177 NJ Super 258, *supra*). While the boundaries of unconstitutional State action may be imprecise, we are convinced that the Surrogate's decree in this case fell well within their embrace.

We are, of course, aware of the holding of the Appellate Division, Third Department, in *Matter of Wilson* (87 AD2d 98), which involved a gender-restricted scholarship fund administered by a private trustee. According to the will which established the trust, the trustee was to select recipients on the basis of high school performance "as may

be certified to" by the superintendent of schools (p 99). When the school district refused to certify information to the trustee, the Appellate Division ordered that the bequest be reformed to provide that students seeking scholarships apply directly to the trustee.

Clearly, the reform ordered in *Wilson* (*supra*) had substantially less impact than the one made by the Surrogate at bar. In any event, to the extent that our holding today may be inconsistent with *Wilson,* we attribute it to a respectful disagreement with our sister court. We find ourselves persuaded, and indeed we are bound to hold as we do, by the constitutional principle that resort may not be had to our judiciary to actively intervene for the purpose of enforcing, promoting or supporting private invidious discrimination (see *Shelley v Kraemer, supra; Barrows v Jackson, supra; Matter of Hoffman,* 53 AD2d 55; *Sweet Briar Inst. v Button,* 280 F Supp 312).

Having concluded, then, that the decree here in issue was an unconstitutional exercise of State judicial power, we hold that the appropriate course is to delete the gender restriction. Significantly, the evidence suggests that such a reformation would be fully consistent with an important, if not the primary, intent of the testator.

In his bequest, Mr. Johnson did not specify qualifications, such as grade average, college entrance examination scores, or class standing, for scholarship recipients (cf. *Matter of Wilson, supra*). Instead, he required only that they be "bright and deserving". The task of determining whether an applicant merited that description fell entirely upon the school district to which, as the record reveals, Mr. Johnson was so strongly devoted. It was plainly his intent to further the success of the district by enabling it to provide scholarship assistance to those graduates it felt to be needy, bright and deserving. It seems clear, therefore, that, contrary to the suggestion in the dissent, Mr. Johnson did not view the function of the school district as merely that of a conduit responsible only "to invest and dole out money for college scholarships". Rather, the school district's role under Mr. Johnson's plan was central to the bequest, for it was the district, as it was the university under the earlier wills, that he judged to be in the best

position to select deserving recipients for his scholarships. Indeed, without input from the school district, the selection process would be substantially impaired (see *Howard Sav. Inst. of Newark v Peep,* 34 NJ 494, 505-509). It was undoubtedly this consideration that led the Surrogate to hold specifically that the private trustee could receive and consider recommendations from the district.

Moreover, there is no indication in the record that Mr. Johnson was of a misogynic bent. It is true that his scholarship bequests were written to benefit young men. Nevertheless, in his 1961 and 1974 wills, he provided that, if the Columbia scholarship fund became impractical to maintain, the corpus would be divided between the university and the district for scholarship purposes. *Significantly, he attached no gender restriction to those alternate scholarship awards.* Based upon these facts, we conclude that, contrary to the views expressed by the Surrogate and by the dissenters, it was at least equally important to Mr. Johnson that the school district carry out the significant and sensitive task of selecting scholarship recipients as that needy, bright and deserving young women be excluded as objects of his bounty.

Finally, we think it appropriate to address some of the observations and arguments advanced by the distinguished dissenters. Contrary to the fears expressed in the dissent, our holding today poses no threat to an individual's general right to dispose of his property as he sees fit and to have his testamentary wishes respected by the courts. We have no quarrel with the dissenters' strong advocacy of a person's right to confer the benefits of his property to groups of his own choosing, and to exclude anyone from his bounty, be they men or women, blacks or whites, Jew or Gentile. And our holding does not limit that right except where State action is involved, for we deem it a matter of fundamental constitutional law that, when one makes a discriminatory disposition of his property, he must do so in a way that does not require the active assistance or substantial involvement of the State in the accomplishment of his purpose.

In this regard, we are somewhat at a loss to understand two arguments advanced by the dissenters addressed to the

issues at bar. They contend that "the mere naming of a public agency as the trustee of a testamentary trust by a settlor does not constitute State action since the public agency has done nothing". They later suggest that "it would be proper to have [the school] serve as trustee of [a sex restricted] trust under appropriate circumstances". In our view, the first argument is entirely irrelevant; the second is simply wrong.

When Mr. Johnson named the school district as trustee, he presumably intended that it act as such. The trust as created was unconstitutional, not because the name of the Croton-Harmon school district appeared in the will, but because the Fourteenth Amendment would not permit the district to perform the function called for in the bequest. Thus, when we say that the bequest was constitutionally infirm, we obviously mean, not that Mr. Johnson was somehow prohibited from writing the will as he did, but that his direction could not be honored consistent with the Fourteenth Amendment.

Moreover, we think that the dissenters' suggestion that the school district could in fact act as trustee under certain circumstances is entirely devoid of merit. In the *Girard* case, for example, the Supreme Court had little difficulty in condemning as unconstitutional the board of trust's serving as trustee, and in fact did so in three sentences: "The Board which operates Girard College is an agency of the State of Pennsylvania. Therefore, even though the Board was acting as a trustee, its refusal to admit Foust and Felder to the college because they were Negroes was discrimination by the State. Such discrimination is forbidden by the Fourteenth Amendment" (*Pennsylvania v Board of Trusts,* 353 US 230, 231, *supra*).

Indeed, even in *Matter of Wilson* (87 AD2d 98, *supra*), upon which the dissent relies, the Appellate Division, Third Department, noted that (p 101) any direction by the court that the school district supply the private trustee with information necessary for the award of gender-restricted scholarships "would raise serious questions as to the constitutional and statutory legality of such an order". We think it settled, therefore, that the school district could not constitutionally serve as trustee under the bequest

here in issue, and it appears that no party to this proceeding has seriously contended otherwise. Thus, the dissenters' repeated observation that the Surrogate was compelled to act because of the district's "unwillingness or inability" to serve as trustee is somewhat mistaken. Whether the district was willing or unwilling to act is irrelevant. It was unable to act because it was constitutionally proscribed from doing so.

Additionally, in the case of a discriminatory trust like the one at bar, the dissenters claim to see no difference between the substitution of one private trustee for another and the substitution of a private trustee for a public one. We think that the distinction is clear. In the first case, the trust as created can be performed without constitutional objection since purely private discrimination is not proscribed. The court's act of substituting trustees is merely ministerial and constitutionally neutral. In the latter case, the Fourteenth Amendment prohibits the performance of the trust as created, and the court's act breathes life into a discriminatory provision which, because of State involvement, was invalid at its inception.

The belated and relatively recent societal and legal acknowledgment that women are entitled to equal protection of the law has led all members of this court to agree that the Fourteenth Amendment would be violated by the expenditure of public funds for gender-restricted educational scholarships. For the reasons previously stated, we think it settled beyond peradventure that the same constitutional strictures apply where, although the funds are private, they are bequeathed to a public agency which is made exclusively responsible both for distributing the funds and selecting the recipients. The dissenters' sweeping policy statements notwithstanding, the question presented is a very narrow one, viz., whether the Surrogate, faced with a trust which could not be constitutionally performed, altered the bequest in a way that was constitutionally permissible. We hold that he did not, for the living document which is our Constitution, and our own sense of fundamental fairness, simply will not permit active court intervention to further and promote discrimination.

For all of these reasons, therefore, we hold that the Surrogate's intermediate decree should be reversed and that the Attorney-General's petition to construe the will so as to delete the gender restriction should be granted.

NIEHOFF, J. (dissenting). For centuries Americans have properly believed that they have the legally protected right, with some few exceptions not applicable here, to will their property to whomever they wish. Today our court holds that notwithstanding the fact that Mr. Johnson, the testator here, had such right, and that it was perfectly legal for him to have chosen the beneficiaries he did, he lost or forfeited that right, and that the court has the power and right to rewrite the will in a way which will enable others not designated as objects of his bounty to share in his estate.

Why is that result called for in his case? Simply because instead of having chosen a private trustee to act for him he selected a school district, a public agency, as trustee, as a consequence of which the Surrogate was called upon either (1) to change the dispositional provisions of the will or (2) to appoint a private trustee as a substitute for the school district and the Surrogate chose to substitute a private trustee for the school district.

The Surrogate was faced with making one of the foregoing choices inasmuch as the school district indicated to the Surrogate that it was unwilling or unable to serve unless the Surrogate changed the dispositional provisions of the trust in a manner agreeable to the trustee. The Surrogate, recognizing his duty to see to it that the testator's clearly expressed wishes were carried out, refused to alter the provisions of Mr. Johnson's trust and, instead, appointed a substitute trustee to implement the testator's wishes (108 Misc 2d 1066). Our distinguished brethren of the majority say that (1) the naming of a school district as trustee, which because of its public nature could not constitutionally carry out the terms of the trust, "tainted" the provisions of the charitable trust and (2) the Surrogate was guilty of unconstitutional "State action" when he removed the "taint" by substituting a private trustee for the school district trustee thereby enabling the trust to be carried out in accordance with Mr. Johnson's wishes.

We, the dissenters, have an entirely different perception of the issue presented by this case and the manner in which it should be resolved.

### I. THE ISSUE

Initially, we find ourselves unable to agree with the opening paragraph of the majority opinion in which the issue in this case is stated as follows: "The issue presented on this appeal is whether the equal protection clause of the Fourteenth Amendment is violated when a Surrogate reforms the provisions of a will so as to give effect to a testimentary bequest which discriminates on the basis of sex."

The Surrogate did not deem it appropriate to reform and did not in fact reform, i.e., amend or improve, the provisions of the testator's will, as the majority asserts. It was the Attorney-General, speaking for himself, and impliedly for the trustee named by the testator, who sought to persuade the Surrogate to amend or improve the dispositional provisions of the will and who let it be known to the Surrogate that the trustee would not serve as such unless the Surrogate adopted the change advanced by the Attorney-General and trustee. The Surrogate, whose function it was to make certain that the testator's lawful wishes were honored, not altered or frustrated, had no real choice but to refuse to amend the will, and to grant the trustee's request to be replaced.

In truth and in fact it is our court which has undertaken to amend the dispositional provisions of the will by disregarding the testator's expressed instructions which were lawful in their nature and by naming other persons as being eligible to share in the testator's estate.

As we see it, the issue in this case should be expressed in the following manner: When a testator sets up a gender-restricted trust and names a public agency as trustee to administer it, and that trustee makes known its unwillingness or inability to serve unless the testator's wishes as to his beneficiaries are altered, does the Surrogate violate the Fourteenth Amendment when he appoints a substitute trustee to carry out the testator's wishes?

We start our discussion with the premise that no constitutional or statutory provision exists which prohibited Mr. Johnson from setting up a trust to provide "scholarships or grants for bright and deserving young *men* who have graduated from the High School of [the Croton-Harmon Union Free] School District, and whose parents are financially unable to send them to college" (emphasis supplied). Indeed, the law clearly authorized Mr. Johnson to select his beneficiaries, which we perceive as meaning that if for reasons which appealed to him he wanted to limit them to "bright and deserving young men" who are graduates of the high school of the Croton-Harmon Union Free School District and whose parents are financially unable to send them to college he had the absolute and unfettered right to do so. The majority does not claim otherwise.

We also think it needs no citation of authorities to establish that while the law recognizes that "bright and deserving young women" have a right equal to that of "bright and deserving young men" to receive college educations, they have no constitutional or statutory right to have compelled Mr. Johnson to include them in his will. Beyond question, if taxpayers' money was being distributed in this case, such money could not be expended for education in a way which would prefer men over women. But, we are not dealing with State funds. Our concern is with the disposition of the private funds of Mr. Johnson who had both the right and the power under our law to choose those whom he would benefit even though other deserving persons might have been excluded. We are satisfied that he clearly and unequivocally chose to bestow his bounty upon needy, bright and deserving young men.

We further believe it is elementary that inasmuch as Mr. Johnson exercised his rights lawfully when he set up the trust for "bright and deserving young men", Mr. Johnson was entitled, after his demise, to expect the courts not to frustrate his lawful intention by rewriting his will so as to produce a result other than the one he intended, however desirable or admirable it might be to do so.

In so stating, we are not espousing sex discrimination or seeking to advance the cause of sex discrimination. Right thinking persons abhor and condemn such discrimination.

Indeed, equal access to educational opportunity is of paramount importance to our society. What we are saying in our dissent is simply that the fact that the law favors equal opportunity for the sexes does not permit us to disregard Mr. Johnson's wishes as expressed in his will and to impose upon Mr. Johnson, posthumously, the requirement that he conform to that policy of the law by our undertaking to change the provisions of his will. We do not think our brethren of the majority think otherwise. But, they feel they must reach the conclusion they do because of the concept of "State action".

Now, there can be no quarrel with the justness of the State action principle which is designed to prevent the State from involving itself in a significant way in activities which are proscribed to the State. The State is to be condemned if it does so and there can be no doubt that the State action rule is a truly salutary rule of law. But, the State action concept is like a hall of mirrors. One can easily become confused and lost in it. It is essential never to lose sight of the fact that it is a rule of reason and common sense conceived to protect us all against unlawful activity by the State or its agents, *not against action by individuals which for them is lawful.* We do not believe that we have the right to extend that principle heedlessly to situations never intended by the framers of our Constitution to be covered by the language of the Fourteenth Amendment. Unless a particular extension can fairly be supported by sound legal reasoning or be founded upon applicable precedent it ought not to be made.

Neither sound legal reasoning nor applicable precedent support the proposition that the mere appointment of a substitute trustee by a Surrogate, regardless of whether the original trustee named was a public agency, constitutes State action which violates the Constitution.

While our colleagues of the majority, who have undertaken to "improve" or "reform" Mr. Johnson's will, undoubtedly consider their decision as being a blow struck against unconstitutional discrimination and one which will advance the cause of equality of the sexes, we view it as an unprecedented assault upon the freedom every indi-

vidual, *man or woman,* in this State has to dispose of *his or her* private property as *he or she* sees fit.

Although the ruling in the case at bar is directed at a trust for needy, bright and deserving young men graduates of the high school of the Croton-Harmon Union Free School District (CHUF), the ruling cannot be said to be restricted to the peculiar facts of this case. The holding lays down a principle of law applicable to all charitable trusts where a public agency is named as trustee. We find the broad implications of the decision to be very disturbing.

Let us suppose that Mr. Johnson was a graduate of a private male college for which he had a great fondness and he wished to encourage others to attend that college. Had he set up a trust naming the school district as trustee and providing that deserving graduates of CHUF high school who attended that college were to be the beneficiaries, which of necessity would be limited to men, would we not have to emasculate the provisions of that will to achieve nondiscrimination? And, what if Mr. Johnson had instructed the school district that his beneficiaries were to be chosen only from graduates of a certain religious faith, or ethnic background. Following the majority's reasoning, the will would have to be "reformed" to include persons of all faiths and ethnic origins else the equal protection clause of the Constitution would be violated.

But, the "fall out" does not end there. It also affects the rights of men and women to set up trusts for women.

Doubtless there are men and women in this State, some of whom have been active in the ongoing and unfinished struggle for equal rights for women, who have an understandable empathy for women and who, because of such sensitivity, wish to give women special help by setting up trusts in which they provide funds for their education. Are we to classify such trusts as "invidiously discriminatory" because they bestow benefits on women only as Mr. Johnson's trust has been labeled by the majority because it assists men only? To be sure, we cannot have two different rules, one for trusts for men and another for trusts for women, and we do not think the majority has suggested otherwise.

Are persons who are rightfully desirous of aiding women to be reproached for setting up trusts whose benefits are restricted to women, as Mr. Johnson seems to have been condemned here for setting up a trust limiting his beneficiaries to needy, bright, and deserving young men? We think that such charitably minded persons ought not to be censured. Likewise, Mr. Johnson ought not to be castigated for the form his benevolence has taken.

Should a person in this State select a school district or other public agency as trustee to administer a trust for "deserving young women" and the trustee declines to administer such trust because it is not gender neutral, our vote would be to uphold the dispositional provisions of such a will and to permit the Surrogate to substitute a private trustee as was done in this case. However, it would seem to follow, as night follows day, that under the holding of the majority, that testator or testatrix will lose or forfeit the right he or she had to choose women as his or her beneficiaries. He or she will have to share his or her property with "deserving young men" as well, contrary to his or her wishes.

Not only are we gravely troubled by what we perceive as an attack by the majority upon freedom of disposition of private property, but we are very much at odds with the reasoning which appears to undergird that attack. It is said that the dispositional provisions of the trust must be altered because of unconstitutional State action. We ask the question: "Where is that State action to be found?" Our answer is there is no unconstitutional State action to be found in this case.

Mr. Johnson did not violate the equal protection clause of the Fourteenth Amendment by limiting his beneficiaries to deserving young men or by naming a public agency as trustee. The Fourteenth Amendment states, in relevant part, that "[n]o State shall make or enforce any law which shall * * * deny to any person within its jurisdiction the equal protection of the laws". By its very language that amendment is directed to the action of the States only, not to that of individuals. Accordingly, Mr. Johnson's acts of limiting his beneficiaries to men, as he had the legal right to do, or of naming a school district as trustee, even though

that trustee was unwilling or unable to act, did not amount to unconstitutional State action. Nor can it properly be said that Mr. Johnson's acts in the foregoing respects "tainted" i.e., corrupted or stigmatized, the will in some way. There was nothing unconstitutional or unlawful in Mr. Johnson's having limited his beneficiaries to men, and the majority does not claim otherwise. Therefore, the restrictive nature of his bequest cannot be said to have "tainted" the will. Likewise, the naming of the school district as trustee did not "taint" the will. At the very most, Mr. Johnson unwittingly chose a trustee who was unable to act for him. But that does not mean that he violated the Constitution.

The school district did not violate the equal protection clause of the Fourteenth Amendment either. The school district was simply named as trustee. Had the Surrogate ordered the school district to carry out Mr. Johnson's wishes and the school district had done so, one might be able to argue that, as a State agency actively involved in carrying out the terms of the trust, the trustee was engaged in State action in violation of the Constitution. But, the Surrogate did no such thing. And, the school district has declined to act in furthering Mr. Johnson's wishes. Hence, its *refusal to act* cannot be classified as unconstitutional State action.

That leaves only the Surrogate's act of appointing a substitute trustee which, likewise, did not amount to unconstitutional State action.

The majority concedes that there would be no unconstitutional State action if the Surrogate had merely "substitut[ed] one private trustee for another to administer * * * [this] discriminatory testamentary trust". That concession, which simply states a principle of established law, constitutes the Achilles heel of the majority opinion. If the Surrogate can substitute one private trustee for another to administer a discriminatory testamentary trust without being guilty of unconstitutional State action, why can he not substitute a private trustee for a public agency trustee without being guilty of unconstitutional State action? In both situations the action of the Surrogate, the State official charged with the unconstitutional State action by

the majority, is precisely the same. In both situations the Surrogate, by appointing a substitute trustee, will, to the exact same degree, be assisting the testator to carry out his discriminatory objective. What is more, the appointment of a substitute trustee by the Surrogate has no effect whatever on those ineligible for scholarship assistance. It deprives them of nothing. At the time of Mr. Johnson's death no female CHUF high school graduate nor any male high school graduate who was not needy, bright and deserving had any right or claim to Mr. Johnson's estate. The appointment of a substitute trustee by the Surrogate did not change that fact. Those ineligible simply remained ineligible. In short, their ineligibility does not turn on who or what entity serves as trustee. Yet the majority classifies the situation involving the substitution of one private trustee for another as permissible and brands the situation involving the substitution of a private trustee for a public agency trustee as constitutionally objectionable. We are unable to perceive a distinction in the two situations.

The majority appears to suggest that there is a distinction because Mr. Johnson's charitable trust "could not constitutionally be performed". Stated somewhat differently, the majority takes the position that the school district could not administer the terms without violating the Constitution. Assuming, *arguendo,* that the trustee was disqualified from acting because of the Constitution, it does not follow that by relieving the school district from doing that which the majority consider would have been unconstitutional action on its part, the Surrogate has violated the Constitution.

Mr. Johnson did no more than make an unwitting mistake or error when he named the school district as his trustee. Must we hold that, as a result, he has forfeited his right to have his property distributed as he directed and that the court can step in and remake the dispositional provisions as it deems appropriate? Why can't the court merely cure the defect by means of judicial surgery eliminating that which the majority claims is contrary to the Constitution and saving that which is not, thereby allowing Mr. Johnson to dispose of his property in his own way? Must we take it upon ourselves to punish Mr. Johnson as

being something of a malefactor because he sought to do what he wanted with his property and was not aware of the complex legal concept known as "State action", a concept whose application is a source of considerable mystery even to legal scholars. In this connection we note that on this very appeal, the court has divided 3 to 2 on the applicability of the doctrine.

If Mr. Johnson had, in the first instance, named a private trustee who refused to serve unless the dispositional provisions of the trust were broadened to include needy, deserving bright young women, and the Surrogate were to have replaced that trustee with a substitute, the majority of this court apparently would not hesitate to affirm the Surrogate's decree. It would not declare Mr. Johnson's right to dispose of his property as he saw fit forfeited and undertake to rewrite the dispositional provisions of the trust. But, for some reason, which we do not believe is supported by logic or law, it believes that it is necessary to declare a forfeiture because Mr. Johnson erred in naming a public school district as trustee. And, there can be no escape from the fact that what the majority is doing is declaring a forfeiture, something which the law abhors and seeks to avoid wherever reasonably possible.

The testator, not the court, is entitled to make a disposition of all his property, and all that the court is permitted to do, as far as legal rules permit, is to effectuate the disposition which the testator has directed. The function of the court is not to draw a new will for the testator but to bring about the result intended by the testator. "It is not the province of the court to speculate on why certain language is used, nor may the court vary or void the terms of a valid will by the exercise of judicial hindsight in order to improve upon the decedent's scheme of testamentary disposition. The courts will not undertake to make a better will * * * for the testator" (64 NY Jur, Wills, § 558).

The object of the court is "not to seek flaws in the instrument and declare it invalid, but rather to sustain it if legally possible * * * Legality, rather than illegality, must be presumed as part of the testator's purpose, and an inference that one is moved by an improper or unlawful

motive should never be drawn when a legitimate purpose is just as apparent" (64 NY Jur, Wills, § 563).

So, in this case, we should presume that Mr. Johnson's motive in setting up a charitable trust limited to needy, bright, deserving young male graduates from CHUF high school was proper, not evil. The trust constituted a lawful disposition of Mr. Johnson's property, as the majority concedes. At the very most, and this we do not concede, the naming of CHUF as trustee was an invalid act. But, the invalid can be separated from the valid by merely substituting trustees as the Surrogate did. Can it be doubted that such course, which upholds and carries out the testator's intention, is preferable to declaring a forfeiture and assuming the power to rewrite the will, changing the beneficiaries in the process?

As we see it, the eminent Surrogate of Westchester County was faced with a choice — substitute a private trustee for the public agency trustee, as he would have done if the original trustee was a private trustee who was unwilling or unable to serve, or change the dispositional provisions of the will. The situation was not so complicated or insoluble that he needed a *deus ex machina* to disentangle it. Cognizant of his obligation to make certain that Mr. Johnson's wishes as to the disposition of his property were carried out, he did nothing more grievous to accomplish that goal than perform the purely ministerial and neutral act of substituting a willing trustee for an unwilling one or one unable to serve. In so doing, he did not violate the Constitution of the United States.

We would affirm the Surrogate's decree.

## II. THERE IS NO LEGAL JUSTIFICATION FOR REWRITING MR. JOHNSON'S BEQUEST

There can be no doubt that we are confronted with a situation in which the charitable intentions of the testator cannot be fulfilled exactly as provided in his will. This does not result from the fact that there are no bright and deserving young men available who can qualify under the terms of Mr. Johnson's will. Rather, this situation has come about solely because the designated trustee is unwilling or unable to serve in that capacity. It does not follow

that because of the unwillingness or inability of CHUF to serve as trustee the bequest must be altered in accordance with the doctrine of cy pres, or reformed, as the majority refers to it. Nor can we agree that an examination of Mr. Johnson's will discloses that it was at least as important to Mr. Johnson that the school district act as trustee as that the scholarships be awarded only to deserving young men.

There is an age old principle now codified in SCPA 1502 to the effect that a testamentary trust will not fail for want of a trustee. That section, which authorizes a court to appoint a successor trustee wherever there is no trustee able to act (SCPA 1502, subd 1), was relied upon by the Surrogate in his decision. Thus, the Surrogate said (p 1072): "Selection by the court of a trustee in place of the board of education to administer the scholarship fund is necessary in order to execute the trust and is specifically provided by law (SCPA 1502)."

The refusal of a named trustee to serve does not involve cy pres considerations (see EPTL 8-1.1, subds [a], [c]). Stated somewhat differently, cy pres comes into play when there is an "indefiniteness or uncertainty of the persons designated as beneficiaries" or "circumstances have so changed since the execution of an instrument making a disposition for religious, charitable, educational or benevolent purposes as to render impracticable or impossible a literal compliance with the terms of such disposition" (EPTL 8-1.1, subds [a], [c]). In the case at bar, the unwillingness or inability of the school district to serve as trustee does not bring about any indefiniteness or uncertainty as to the persons designated as beneficiaries and is not such a change in circumstances as to render impracticable or impossible a literal compliance with the terms of the disposition made by Mr. Johnson, except in the very narrow sense, which is not at all controlling, that CHUF will no longer be selecting the recipients of the awards. Manifestly, the want of a trustee is simply not the type of change in circumstances envisaged by EPTL 8-1.1 as to call for a rewriting of Mr. Johnson's will, particularly since it is abundantly clear therefrom who it was that Mr. Johnson wished to benefit with his money. Hence, it is unnecessary

to invoke the cy pres doctrine (EPTL 8-1.1, subds [a], [c]) on the facts before us.

We consider it beyond question that Mr. Johnson knew whom he wanted to benefit with his funds and expressed his wishes plainly. As the Surrogate wrote in his opinion (p 1068): "The expressed purpose of testator to provide scholarships for 'bright and deserving young men' is set forth in the will clearly and without ambiguity. No alternative or gift over is provided and no construction is required to ascertain testator's intent or dominant purpose."

Ordinarily, the intent of a testator is to be gleaned from within the four corners of the will. The court must search, not merely for the testator's probable intention, but for the intention which the will itself, either expressly or by implication, declares, and all rules of interpretation are subordinated to the requirement that the actual purpose of the testator be sought as far as is consonant with principles of law and public policy (*Matter of Fabbri,* 2 NY2d 236, 239-240). Rules of construction are to be applied for the purpose of determining the testator's intent where the intent is not clearly expressed by the testamentary words, and such rules are to be disregarded when the language is clear and definite (61 NY Jur, Trusts, § 122). Thus, rules of construction are merely subsidiary aids which are not to be employed unless needed and if the "intention of a will-maker is to be found in the words used in the will and these are clear and definite there is no power to change them" (*Matter of Bisconti,* 306 NY 442, 445).

In the present case, Mr. Johnson decreed that the income from the trust which he set up was to be used, each year, to provide "scholarships or grants for bright and deserving young *men* who have graduated from the High School of such School District [Croton-Harmon Union Free School District], and whose parents are financially unable to send them to college" (emphasis supplied). The language selected by the testator is clear and unambiguous. He intended to provide scholarships for bright and deserving young *men* who are graduates of the high school of CHUF and there is not the slightest suggestion in those words that he intended to include any other than men in his bequest. The words employed by Mr. Johnson are so clear

and certain that there is no reason to hold that he meant something other than what he so plainly wrote. Had he intended to include women in the bequest he could have accomplished that purpose by writing "bright and deserving young men and women", or "bright and deserving young graduates", or "bright and deserving young persons". Instead, he said "bright and deserving young men" and the court should not feel free to ignore the language used by Mr. Johnson in the interest of being more benevolent than Mr. Johnson.

As we read the will CHUF was simply named as trustee in order to invest and dole out the money for college scholarships. CHUF was not intended to be the recipient of any portion of Mr. Johnson's estate and was not to benefit therefrom in any way. The money was to go to the young men for their college educations. Hence, it cannot be fairly said that Mr. Johnson intended to benefit CHUF, which was to receive no part of his funds, and that the needy, bright, and deserving young male graduates who were to receive the annual scholarships or grants were of only secondary importance or of only equal importance with the school district.

Of course, in all fairness it must be said that the majority does not claim that Mr. Johnson intended to benefit CHUF. But it does assert that the record establishes that it was at least as important to Mr. Johnson that the school district act as trustee as that the scholarships be awarded only to deserving young men. Here, again, we cannot concur.

Our conclusion that the school district, as trustee, was of only secondary importance to Mr. Johnson is supported by the weight of established authority. As stated earlier, the charitable trust before us states in no uncertain terms that its purpose is to provide scholarships for needy, bright and deserving male graduates of CHUF high school. Scott on Trusts tells us that: "Where a testator devises or bequeaths property to * * * be applied to a particular charitable purpose, it is to be inferred that the application of the property to the designated purpose is the testator's primary intention, and that the choice of the organization to make the application is secondary. In such a case the fact that the corporation named is unwilling or unable to accept the gift

and to apply the property to the designated purpose does not cause the disposition to fail" (4 Scott, Trusts [3d ed], § 397.3, pp 3044-3045). Likewise it is noted in Bogert on Trusts that: "The court regards the expression of a charitable trust intent and the indication of a class of beneficiaries as the important factors in creation. The personality of the trustee is not vital. There are many possible trustees available. The court can easily supply a trustee. The important matter is that the benefits of the property in question should be applied toward the described social purpose" (Bogert, Trusts and Trustees [2d ed, rev], § 328, pp 609-610).

Thus, it is well established that the expression of a charitable trust intent and the indication of a class of beneficiaries are the important factors in creation. The identity of the trustee is incidental. Lest there be any claim that Mr. Johnson's prior wills evidence his long-standing devotion to CHUF we would point out that the only constant in the three wills referred to by the majority was Mr. Johnson's unmistakably clear intent to provide scholarship assistance for needy young male graduates from CHUF's high school and that if anything can be gleaned from a comparison of the three wills it is that Mr. Johnson had little concern for the particular trustee who held his residuary estate as long as the income therefrom was used to help bright, deserving young men from CHUF to attend college.

It is true that after specifying the class of beneficiaries who were to be entitled to receive Mr. Johnson's bounty the will provides that the beneficiaries "shall be selected by the Board of Education of such School District with the assistance of the Principal of such High School". But the fact that Mr. Johnson was looking to CHUF to select potential recipients does not mean that Mr. Johnson, if faced with a choice of having to broaden the class of beneficiaries in order to retain the services of CHUF in selecting from the class, or of keeping the class and having a different trustee make the selection, would have opted for the former. The string of wills mentioned above establish by clear and convincing evidence that Mr. Johnson had a fixed purpose in mind — to award scholarships to deserv-

ing, needy young men graduates from his home school district — and that the choice of trustee was merely incidental thereto. There is no reason why the private trustee named by the Surrogate cannot obtain all the material necessary to ascertain the relative merit and worthiness of applicants.

The Surrogate, recognizing the school district's reluctance to administer the trust, provided for the substitution of a private trustee who would select scholarship recipients and limited CHUF"s role to making recommendations to the trustee. The Surrogate appreciated that by taking that action he could discharge his duty and responsibility of seeing to it that Mr. Johnson's intention be carried out as nearly as possible. However, there remains for us to consider the question of whether, for some constitutional reason, it was impermissible for the Surrogate to have taken the course he did.

### III. THERE IS NO LEGAL BASIS FOR HOLDING THAT THE SURROGATE'S ACT OF APPOINTING A SUBSTITUTE TRUSTEE AMOUNTED TO STATE ACTION WHICH VIOLATED THE EQUAL PROTECTION CLAUSE OF THE FEDERAL CONSTITUTION

We start our discussion of the State action question with the same premises as we started this opinion, namely, that not one student of CHUF, male or female, had any rights with respect to Mr. Johnson's personal fortune prior to his death and that upon his death, needy, bright and deserving young male graduates of the district high school became eligible for scholarship assistance to the exclusion of females (and for that matter males from affluent families). Throughout its opinion the majority appears to concede that such distinction is a lawful one absent State involvement.

We also reiterate the indisputable principle that "bright and deserving young women" graduates of the high school of CHUF had no constitutional or statutory right to share in Mr. Johnson's estate.

Since Mr. Johnson had the absolute right to set up a male restricted trust, did he not also have the corollary right to expect the courts of this State to *permit* his wishes,

which were plainly lawful, to be carried out? We believe the obvious answer to that question is "yes". It seems to us to be entirely illogical to conclude that Mr. Johnson had the right to dispose of his property as he saw fit but that such right was a mere abstract or theoretical one which could not legally be carried out because of Surrogate's Court involvement of the limited type with which we are here concerned.

Notwithstanding the fact that the majority recognizes Mr. Johnson's right to choose, and in choosing limit his beneficiaries, the decision rendered by the majority results in a holding to the effect that because of the provisions of the Federal Constitution as to equal protection of the laws Mr. Johnson's will cannot be carried out and that persons other than those chosen by him are entitled to participate in his estate. That conclusion is reached by means of an application of the "State action" doctrine to the act of the Surrogate in appointing a substitute trustee.

The heart of the majority's opinion on this issue is to be found on pages 15 and 16 thereof. In the first and lengthier paragraph the court tells us what it does not hold, and it then concludes with one short paragraph in which the holding of the opinion is stated. We believe it essential to analyze those paragraphs seriatim.

First, the court states: "[W]e take care to note that we are not holding that the largely ministerial and neutral judicial acts of merely admitting to probate a will containing a discriminatory bequest, or of substituting one private trustee for another to administer a discriminatory testamentary trust, constitute State action for the purposes of the Fourteenth Amendment (see *Gordon v Gordon,* 332 Mass 197, cert den 349 US 947; *United States Bank of Portland v Snodgrass,* 202 Ore 530; *Matter of Potter,* 275 A2d 574, 580 [Del]). Nor do we hold that the act of a court in upholding the discriminatory provisions of a purely private trust against an outside challenge involves the State in unconstitutional discrimination (see, e.g., *Lockwood v Killian,* 172 Conn 496)."

Thus, the majority holds, and we agree, that a Surrogate may (1) admit to probate a will containing a discriminatory trust; (2) act in substituting one private trustee for another

private trustee of a discriminatory testamentary trust; and (3) uphold a discriminatory trust against an outside challenge *even though such judicial activity will result in the enforcement of the discriminatory provisions of the testamentary trust.* The reasoning behind the above holdings is relatively uncomplicated and exceedingly sound, to wit, private discrimination is not unlawful and does not violate the Constitution and the Surrogate's neutral judicial acts of admitting a will to probate, substituting one private trustee for another, or upholding a will from outside attack cannot constitute State action which would violate the Constitution. Despite that holding the majority goes on to say: "We hold only that, presented with an invidiously discriminatory charitable trust which could not be constitutionally performed, the Surrogate was precluded by the Fourteenth Amendment from actively intervening to reform the trust in a way that had the 'immediate objective' and 'ultimate effect' of enforcing its discriminatory provision (*Reitman v Mulkey,* 387 US 369, 373, *supra;* see *Shelley v Kraemer,* 334 US 1, *supra; Barrows v Jackson,* 346 US 249, *supra; Commonwealth of Pennsylvania v Brown,* 392 F2d 120, cert den 391 US 921, *supra; Matter of Crichfield Trust,* 177 NJ Super 258, *supra*). While the boundaries of unconstitutional State action may be imprecise, we are convinced that the Surrogate's decree in this case fell well within their embrace."

As the majority candidly concedes, Mr. Johnson had the absolute right to set up a male restricted trust but it concludes that "as written, Mr. Johnson's bequest was fatally flawed, for an agency of the State cannot constitutionally administer a scholarship program which discriminates on the basis of sex". Assuming, *arguendo,* the accuracy of the conclusion that "an agency of the State cannot constitutionally administer a scholarship program which discriminates on the basis of sex", it most certainly does not follow that anything (1) Mr. Johnson did, (2) the school district did, or (3) the Surrogate did, amounts to unconstitutional State action, or that the will was fatally flawed, requiring that the dispositional provisions be rewritten by the court.

As noted at the beginning of this opinion, by its very language the Fourteenth Amendment is directed to the action of States only, not that of individuals, and the United States Supreme Court has firmly established the principle that the equal protection clause of the Fourteenth Amendment is a restriction on the State governments and operates exclusively upon them and their agents (see *Truax v Corrigan,* 257 US 312). It is equally well settled that the equal protection clause was designed as a safe-guard against acts of the State, and not against the conduct of private individuals or persons (see *Dorsey v Stuyvesant Town Corp.,* 299 NY 512). Clearly then, nothing Mr. Johnson did comes within the ambit of the equal protection clause. This is so whether we are talking about the creation of the subject trust, the naming of the limited class of beneficiaries, or the naming of the trustee to administer the trust. Without a doubt, the mere naming of a public agency as the trustee of a testamentary trust by a settlor does not constitute State action since the public agency has done nothing, i.e., it has never acted. Rather, it is only when the public agency becomes actively engaged in the administration of the trust, that is, when there is "State action" in the situation, that the equal protection clause comes into play and must be considered to determine if it is unconstitutional State action.

This point was emphasized by Justice DOUGLAS in the case of *Evans v Newton* (382 US 296, 300) wherein he wrote: "If a testator wanted to leave a school or center for the use of one race only and in no way implicated the State *in the supervision, control, or management* of that facility, we assume *arguendo* that no constitutional difficulty would be encountered" (emphasis added).

Having started with the premise that Mr. Johnson's will was "fatally flawed" because he named a public agency as trustee the majority goes on to say that by substituting a private trustee for the school district, i.e., by removing the flaw, the Surrogate's decree falls within the ambit of unconstitutional State action. The majority so holds in spite of its unequivocal statement, quoted above, to the effect that the Surrogate's substitution of one private trustee for another private trustee is not State action. That is,

while the majority acknowledges that the Surrogate's substitution of one private trustee for another private trustee would not constitute unconstitutional State action, it holds that the substitution of a private trustee for a public trustee, even one who has not acted, does constitute unconstitutional State action. As we said earlier, we see no distinction in kind in the two situations and fail to see how a Surrogate's substitution of a private trustee for a public trustee who has not even acted under the will suddenly ripens into unconstitutional State action for Fourteenth Amendment purposes. In both situations the Surrogate will be aware of the discriminatory nature of the trust and in both instances the Surrogate, by appointing a substitute trustee, will, in a sense, be assisting the testator to carry out his discriminatory objective. What is more, the degree of involvement in enforcement by the Surrogate is identical. Why should there be any difference in Fourteenth Amendment result if the trustee replaced is either a public agency or a private person? The end result of the Surrogate's action is the same in both cases. The trust is carried out as written even though it is discriminatory.

Not only do we not perceive the logic in the distinction drawn by the majority but we fail to see that the cases relied upon by the majority support its argument that such a distinction is a legally sound one.

The case of *Reitman v Mulkey* (387 US 369, *supra*), cited by the majority, involved the interpretation of an amendment to the California Constitution (art I, § 26). There the State of California had taken affirmative action by legislation designed to encourage private discrimination in housing. In reality, the State was seeking to establish discrimination in housing as its public policy. As both the Supreme Court of California and the United States Supreme Court held, the purpose of the legislation was to make the State a partner in discrimination. The holding in that case is hardly relevant to the matter before us. Here, there is no question that it was perfectly legal for Mr. Johnson to limit his beneficiaries as he did and the question before us is solely whether the substitution of a private trustee for a public agency trustee violates the Constitution when the substitution of a private trustee for a private trustee does

not? The latter situation does not make the State a partner in discrimination. Why should the former?

*Shelley v Kraemer* (334 US 1, *supra*) involved the direct enforcement of racially discriminatory restrictive covenants by Missouri and Michigan State courts. The United States Supreme Court found State action holding that (pp 13-14, 19), "the purposes of the agreements were secured only by judicial enforcement by state courts of the restrictive terms of the agreements" and that "but for the active intervention of the state courts, supported by the full panoply of state power, petitioners would have been free to occupy the properties in question without restraint." In that case, action by the courts would have deprived the petitioners of the right to live where they chose, rights which they had secured under contracts. We have no such situation here.

As pointed out above, at the time of Mr. Johnson's death, no female CHUF high school graduate who was not needy, bright and deserving had any right or claim to Mr. Johnson's estate. This is so irrespective of who or what entity was named by Mr. Johnson to act as trustee. It is equally true with respect to who or what entity ultimately serves as trustee of the residuary trust. Inasmuch as the appointment of a substitute trustee by the Surrogate did not change that fact and had no effect whatsoever on those ineligible for scholarship assistance it can hardly be said that the Surrogate's act constitutes significant State involvement.

In other words, the appointment of a successor trustee did not result in depriving those previously ineligible for scholarship grants of any material thing whatsoever, and had no effect upon the existing gender discriminatory trust.

*Barrows v Jackson* (346 US 249, *supra*) is similar to *Shelley v Kraemer* (*supra*). It held simply that the enforcement of a covenant forbidding use and occupancy of real estate by noncaucasians, by an action at law in a State court to recover damages from a cocovenantor for a breach of the covenant, is barred by the Fourteenth Amendment of the Federal Constitution. That case is by no means authority for the proposition that in relieving a public agency

from acting as trustee and appointing a private one in its place, there is a violation of the Fourteenth Amendment.

The *Girard College* case (*Commonwealth of Pennsylvania v Brown,* 392 F2d 120, cert den 391 US 921, *supra*), is also readily distinguishable from the case at bar. That case concerned itself with a situation of aggravated State involvement for a period in excess of 100 years in a racially discriminatory trust. There for more than 100 years the State had been an active partner in the discrimination. City officials had administered the trust as trustees for that period of time and the Legislature examined and audited the Girard College accounts annually. Clearly, the facts of that case bear no resemblance to those at bar. That case cannot properly be cited as one which warrants the result which the majority has reached here.

Like *Commonwealth of Pennsylvania v Brown (supra)*, the case of *Matter of Crichfield Trust* (177 NJ Super 258, *supra*), decided in 1980, almost 50 years after the establishment of the trust, involved an ongoing existing testamentary trust which had been administered by a public trustee for that period of approximately 50 years. The trust in question was created in 1932 by Frieda M. Crichfield, a woman, and provided for an annual stipend of $400 to "worthy boys of Summit High School". Not surprisingly, the Chancery Division of the New Jersey Superior Court found the "Board's action in administering the trust is state action" (177 NJ Super 258, 261). The court proceeded to apply the cy pres doctrine and modified the trust in accordance with the trustee's request by eliminating the sex-based classification and allowing the trustee to increase the award to an amount equal to $1,300, the annual current trust income. In so doing, the court said the following (p 261): "At the time the trust was created in 1932 few female graduates of Summit High School sought higher education and the settlor may not have foreseen the change in the number of women pursuing higher education and the growth in public and legal awareness of sex discrimination." Thus, the court considered the will a proper subject "for adaptation to circumstances which the settlor may not have foreseen", and reconstrued it (177 NJ Super 258, 260).

Mr. Johnson's will is quite different. There is no room to say that he may have intended to include all worthy young people in his benevolence. At the time he wrote his will in 1975, it had become equally common for young women to attend college as it was for young men to do so and yet Mr. Johnson persisted in specifying "men" in his will. Furthermore, the protracted involvement of the school board in administering the trust for almost 50 years distinguishes *Matter of Crichfield Trust (supra)* from the instant matter and renders the case inapposite herein.

Thus, we are of the view that the majority has cited no authority which truly supports its conclusion that the Surrogate's appointment of a private trustee to replace the school district, in and of itself, amounted to State action, and that the majority's conclusion has expanded the concept of State action far beyond any application to date. Contrary to the majority, we are of the opinion, for reasons already given, that the facts and circumstances of the case before us lead to the inescapable conclusion that the mere appointment by the Surrogate of a substitute trustee for CHUF cannot reasonably result in a finding of State action herein.

The appointment of a successor trustee did not result in depriving those previously ineligible for scholarship grants of any material thing whatsoever and had no effect upon the existing gender discriminatory trust. In short, the conduct allegedly causing the deprivation of a Federal right is not fairly attributable to the State.

Recently, in the case of *Lugar v Edmondson Oil Co.* (457 US 922, __, 102 S Ct 2744, 2754), the United States Supreme Court discussed the question of fair attribution and held in relevant part:

"As a matter of substantive constitutional law the state action requirement reflects judicial recognition of the fact that 'most rights secured by the Constitution are protected only against infringement by governments,' *Flagg Brothers, supra,* 436 U.S., at 156, 98 S.Ct., at 1733. As the Court said in *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 349, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974):

" 'In 1883, this Court, in the *Civil Rights Cases,* 109 U.S. 3 [3 S.Ct. 18, 27 L.Ed. 835], affirmed the essential dichot-

omy set forth in [the Fourteenth] Amendment between deprivation by the State, subject to scrutiny under its provisions, and private conduct, "however discriminatory or wrongful," against which the Fourteenth Amendment offers no shield.'

"Careful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power. It also avoids imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed. A major consequence is to require the courts to respect the limits of their own power as directed against state governments and private interests. Whether this is good or bad policy, it is a fundamental fact of our political order.

"Our cases have accordingly insisted that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the state."

Because this is a private discrimination case, we see no useful purpose to be served in distinguishing the other cases cited by the majority which for the most part deal with public or quasi-public discrimination issues. It is sufficient to say that the existing authority which most closely parallels the case at bar supports our position. Those cases include *Matter of Wilson* (87 AD2d 98), a case similar to the one before us, wherein the Appellate Division, Third Department, upheld a gender-restricted trust but eliminated the role of a public school district in awarding annual scholarships to "young men" although the district had already participated in the administration of the trust for 11 years. In order to effectuate the trust for young male graduates of the Canastota High School the court simply removed the school district from its role in certifying the information necessary to enable the trustee to make the awards to the graduates. The court refused to accept the suggestion that the trust's gender-restricted terms be altered. Thus, the court said (87 AD2d 98, 102, *supra*): "Appellants next contend that regardless of the testator's intent, the gender restriction should be removed because it is adverse to the State's public policy of promoting equal opportunity in education. However, although a

gender-neutral educational trust is preferable on public policy grounds to one which imposes a gender restriction, there is another competing public policy consideration, namely, preserving the right of the testator to dispose of his property as he wishes (see *Matter of Hughes,* 225 App Div 29, affd 251 NY 529). This rule becomes even more compelling when applied to the area of private charitable trusts, for one of the very reasons for the rule is to encourage bequests for charitable purposes. A provision for the furtherance of education and learning is, without question, a charitable purpose (*Butterworth v Keeler,* 219 NY 446). Therefore, while a gender-neutral provision would be preferable, we decline to adopt a rule the effect of which would be to permit a court to exercise its cy pres powers according to its perception of current public policy, rather than in accordance with the unambiguous intent of the testator. Thus, although the terms of the trust restrict, in part, the beneficiaries thereof to a particular class, its validity is not impaired as long as the general and dominant purpose of the trust is charitable or educational in nature (*Matter of Rupprecht,* 271 App Div 376, affd 297 NY 462; *Matter of Johnson,* 108 Misc 2d 1066)."

In *Matter of Cram* (__ Mont __, 606 P2d 145) the Supreme Court of Montana was faced with a testamentary trust which excluded female members of the 4-H Club of Montana and female members of Future Farmers of America (FFA) from becoming eligible recipients under the trust while allowing male members of such organizations to become eligible. The trustee petitioned for instructions. A female FFA member, the State Human Rights Commission, and the Superintendent of Public Instruction appeared and requested reformation of the trust so as to eliminate the discriminatory provisions and make the trust gender neutral (not unlike the case at bar). The Eighth District Court, Cascade County, modified the trust be removing the FFA and 4-H Club State leaders from the mechanics of the trust. The Supreme Court of Montana affirmed, holding that by eliminating the public organizations from the mechanics of the trust, State action had also been removed. The court concluded its opinion with these words (p __, p 150): "We hold that the modified Cram trust

is enforceable in its present form. A private person has the right to dispose of his money or property as he wishes and in so doing may lawfully discriminate in regard to the beneficiaries of his largess without offending the equal protection clause as long as the State and its instrumentalities are not involved, and unless the trust is unlawful, private trusts are to be encouraged."

The case of *Shapiro v Columbia Union Nat. Bank & Trust Co.* (576 SW2d 310 [Mo]), is another similar case. There, one Victor Wilson established a private charitable trust to assist deserving resident "boys" in obtaining university educations. A female law student brought an action alleging that she was denied an opportunity to apply for and be considered for financial aid from the trust established by Wilson. The University of Missouri at Kansas City, a public institution, accepted and processed the applications of prospective recipients for financial aid from the Wilson trust. Agents of the university nominated qualified male students and forwarded those names to a private trustee who approved the names of the male students and then awarded the scholarship funds. The private trustee had the ultimate and final power to determine which qualified boys would finally be awarded scholarship funds. The Missouri Supreme Court determined that the participation by the agents of the State university was not of such a significant extent in any of its manifestations or so entwined with private conduct that State action resulted. The court held that neither the equal protection clause nor Civil Rights Act was violated and affirmed the dismissal of the female law student's petition.

The United States Supreme Court has said that "where the impetus for the discrimination is private, the State must have 'signficantly involved itself with invidious discriminations,' *Reitman* v. *Mulkey,* 387 U.S. 369, 380 (1967), in order for the discriminatory action to fall within the ambit of the constitutional prohibition" (*Moose Lodge No. 107 v Irvis,* 407 US 163, 173).

The Surrogate's substitution of a trustee, be it a private trustee for a private trustee or a private trustee for a public agency trustee, cannot be said to significantly involve the State in carrying out the restrictive provisions of Mr.

Johnson's trust. The State will not be controlling or managing the distribution of Mr. Johnson's funds and no act of discrimination has been or is being committed by the Surrogate.

As noted by the Supreme Court in *Lugar v Edmondson Oil Co.* (457 US 922, __, 102 S Ct 2744, 2754, *supra*) the State action principle requires that the courts "respect the limits of their own power as directed against state governments and private interests." We think the view adopted by the majority fails to heed the warning contained in that language.

Up to this point we have assumed, for purposes of argument, that the school district could not constitutionally administer the trust as written, and we have sought to show that such fact does not convert the Surrogate's act of substituting trustees into unconstitutional State action and does not call for a different result than when he substitutes a private trustee for a private trustee. However, it is not at all clear that a school district cannot constitutionally administer a private scholarship program which discriminates on the basis of sex.

As stated by the majority the proposed settlement of this matter was due in large part to the Department of Health, Education and Welfare's investigation to determine if CHUF was acting in violation of title IX of the Education Amendments of 1972 (Pub L 92-318; 86 Stat 373; US Code, tit 20, § 1681 *et seq.*). Title IX proscribes gender discrimination in education programs or activities receiving Federal financial assistance. Section 1681 of title 20 of the United States Code provides that but for nine exceptions which are inapplicable herein: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance". (US Code, tit 20, § 1681, subd [a].)

Section 1682 of title 20 of the United States Code authorizes agencies awarding Federal financial assistance to education programs or activities to effectuate the provisions of the foregoing section by promulgating appropriate

regulations (*University of Richmond v Bell,* 543 F Supp 321, 324).

In 1975 the Department of Health, Education and Welfare invoked its section 902 (US Code, tit 20, § 1682) authority to issue regulations governing the operation of Federally funded education programs, which regulations extended "for example, to policies involving admissions, textbooks, and athletics" (*North Haven Bd. of Educ. v Bell,* 456 US 512, 516).

The regulations concerning financial assistance are found in 34 CFR 106.37. Under regulation 34 CFR 106.37(a), except as to financial aid established by certain legal instruments and athletic scholarships, a recipient (which is defined in 34 CFR 106.2 [h] as, *inter alia,* "any State or political subdivision thereof * * * to whom * * * assistance is extended directly or through another recipient") may not discriminate in any manner on the basis of sex to provide different amounts or types of financial assistance. As can be seen from the above, an exception to that general proposition exists with respect to financial aid established by certain legal documents. The exception which covers situations such as the one at bar involving the administration of scholarships created by will is found in 34 CFR 106.37(b) and reads as follows: "(b) *Financial aid established by certain legal instruments.* (1) A recipient may administer or assist in the administration of scholarships, fellowships, or other forms of financial assistance established pursuant to domestic or foreign wills, trusts, bequests, or similar legal instruments or by acts of a foreign government which requires that awards be made to members of a particular sex specified therein: *Provided,* That the overall effect of the award of such sex-restricted scholarships, fellowships, and other forms of financial assistance does not discriminate on the basis of sex."

Hence, title IX and the regulations promulgated thereunder do not totally bar public schools from participating in gender-restricted scholarships. Rather, the regulations require schools to award an equal amount of financial assistance to male and female students in the aggregate. Stated differently, the regulations *specifically permit* CHUF to award the scholarship established by Mr. John-

son's will if female students in that district receive the same amount of financial assistance from other sources such as a trust restricted to women.

The Federal regulations cited above demonstrate an awareness by the Federal authorities that it is not uncommon for Americans to set up scholarship-type trusts limited to one sex with public school districts as trustees and a further awareness of the fact that such trusts are quite legal.

Contrary to the implication that CHUF could never act as trustee of a sex-restricted trust, there is reason to hold that it would be proper to have CHUF serve as trustee of such a trust under appropriate circumstances. So, for example, if at the time of Mr. Johnson's death there was available a separate scholarship fund for the benefit of deserving, bright young women, whether the scholarship was created by Mr. Johnson, or any third person with CHUF as its administrator, the school district's administration of Mr. Johnson's trust would be perfectly proper and not contestable.

Presumably, the Federal regulations were written with the Fourteenth Amendment in mind and, unless we are ready to hold that they are unconstitutional, it would follow that school districts are not, *ipso facto,* prohibited from administering sex-restricted trusts.

The record before us is barren of any evidence concerning the existence or nonexistence of scholarship assistance available to CHUF graduates. And that is for good reason, since such evidence would be relevant solely on the issue of whether CHUF was justified in its refusal to undertake the administration of Mr. Johnson's trust, an issue which was not before the Surrogate and is not before us.

Of course, it may be argued that CHUF's expressed fear of losing Federal funds if it were to undertake the administration of Mr. Johnson's will is proof enough that there were no similar funds available to needy, deserving, bright young women. But, even if that be deemed an established fact, which would mean that the school district could not legally *administer* the Johnson trust, the most that means is that CHUF was justified in refusing to act. It does not

follow that the Surrogate violated the equal protection clause of the Constitution when he relieved the school district and allowed a private trustee to carry out the lawful provisions of the will.

In one of the final paragraphs of its opinion the majority maintains that there is a clear distinction between substituting a private trustee for a private trustee and substituting a private trustee for a public one. It is said that "[i]n the latter case, the Fourteenth Amendment prohibits the performance of the trust as created, and the court's act breathes life into a discriminatory provision which, because of State involvement, was invalid at its inception." We think that the two situations cannot be so distinguished. The so-called discrimination, or gender-restricted provision, relates to the persons who will be the beneficiaries. That provision is the same whether the original trustee named be private or public. Such dispositional provision was not invalid at its inception — it was lawful. At the worst, and we do not concede it to be so, the naming of the public agency was "invalid at its inception" because the trustee could not act. But, when the Surrogate allows such trustee to refuse to act and replaces it, he breathes no more life into the gender-restricted provision than he does when he replaces a private trustee. The lawful, dispositional provision, although gender restricted, is carried out in both instances to the very same degree and the Surrogate's role is precisely the same.

We end as we began. This case does not involve a violation of the Fourteenth Amendment to the Constitution of the United States. Mr. Johnson, the now deceased individual in this drama whose charitable intentions have come under fire and whose property is the subject of this dispute, did not violate the Constitution when he set up a trust for needy, deserving young men as he had the legal right to do, or by simply naming the school district to serve as trustee. The school district, which declined to act as such unless the Surrogate rewrote the provisions of Mr. Johnson's will, did not violate the Constitution when it declined to act. Lastly, the Surrogate who did nothing more than perform the judicially neutral or ministerial act of substituting a willing trustee for an unwilling one, or one who

was disqualified from serving, did not deny or deprive young women in the subject school district of equal protection of the laws or in any other way violate the Constitution.

We agree with the majority that the Constitution is a living document. But, it is not to be interpreted in such a way that the fundamental right one has to dispose of his or her property as he or she sees fit is to be snuffed out and the terms of the will rewritten as to the beneficiaries simply because the decedent, without any malice or improper motive, selects a public agency as trustee.

The day may come when the State will have the unfettered power to dictate how an individual may dispose of the property he or she has acquired in his or her lifetime or to write a "better" will for a resident than he or she may write for himself or herself, but such day has not yet arrived.

Therefore, we the dissenters, have no choice but to vote to affirm the intermediate decree of the Surrogate.

WEINSTEIN and BROWN, JJ., concur with MOLLEN, P. J.; NIEHOFF, J., dissents and votes to affirm the intermediate decree, with an opinion, in which BOYERS, J., concurs.

Intermediate decree of the Surrogate's Court, Westchester County, dated September 10, 1981, reversed, on the law, without costs or disbursements, and the Attorney-General's petition for a construction of article SIXTH of the will of Edwin Irving Johnson so as to delete the word "men" and to insert in place thereof the word "persons" is granted.