In the Matter of the WILL of
Benjamin POTTER.

Mrs. Margaret P. WELLER, Agent of the
above Trust, Plaintiff,

v.

FARMERS BANK OF the STATE OF DELAWARE, Trustee of the Will of Benjamin Potter, and David P. Buckson, Attorney General for the State of Delaware, Defendants.

Court of Chancery of Delaware,
Kent.

Oct. 30, 1970.

---

Joshua M. Twilley, Dover, for plaintiff Margaret P. Weller.

John J. Schmittinger, of Schmittinger & Rodriquez, Dover, amicus curiae in support of the validity of the Potter Trust.

Hugh L. Corroon, of Potter, Anderson & Corroon, Wilmington, amicus curiae in opposition to the validity of the Potter Trust.

Thomas P. Sweeney, of Richards, Layton & Finger of Wilmington, for the defendant trustee, Farmers Bank of the State of Delaware.

Edward J. Wilson, Deputy Atty. Gen., for David P. Buckson, Atty. Gen. of the State of Delaware.

MARVEL, Vice Chancellor:

Margaret P. Weller, the plaintiff herein, serves as agent for the Benjamin Potter trust by appointment of the Chancellor. She is charged, within the confines set by law, with responsibility for the distribution to individual members selected by her out of the class of beneficiaries designated in the last will and testament of Benjamin Potter of income derived from the aforesaid charitable trust as directed by the testator who died in Kent County in 1843.

Mrs. Weller seeks instructions as to whether or not she may, notwithstanding the directions in said trust to the contrary, distribute trust income " * * * to residents of Kent County who are not white, or whether she is bound by the terms of the Benjamin Potter will to distribute trust moneys only to white residents of Kent County * * *", the latter having been designated by the testator's will and third codicil thereto as the income beneficiaries of the residue of his estate.

The late Colonel Potter left express testamentary directions that income derived from the residue of his estate should be distributed " * * * to and for the use support maintenance and education of the poor white citizens of Kent County generally * * *", by agents to be appointed by the Orphans Court or the Levy Court of Kent County. However, as matters worked out, agents for the trust, since its establishment, have, in fact, been appointed by the Chancellor of the State of Delaware, who has also named the first and successive trustees as a result of the declination to serve of the trustees named in Colonel Potter's last will and testament.

Mrs. Weller's petition was filed because of the fact that she has received an application for financial assistance from a resident of Kent County " * * * who is not white * * *" but who otherwise " * * appeared to meet all of the normal qualifications for assistance from the Potter Trust * * *". And while non-whites have never knowingly been made recipients of Potter trust income, petitioner prays to be instructed as to whether or not such type of discriminatory action is violative of the constitutional principle of equal protection of the laws as was found to be the case in Pennsylvania v. Brown (CA 3) 392 F.2d 120, cert. denied 391 U.S. 921, 88 S.Ct. 1811, 20 L.Ed.2d 657, a case concerned with a charitable trust established for " * * * poor male white orphan children * * *" under the will of Stephen Girard, who was, incidentally, a contemporary of Colonel Potter.

The Farmers Bank of the State of Delaware, which is the present trustee of the Potter trust, and the Attorney General of the State of Delaware, who is charged with responsibility for enforcing public charitable trusts, having been joined as parties defendant to this proceeding, the former answered to the effect that the terms of the Potter trust here in issue must be reformed in order to entitle such trust to tax-exempt status as defined in the Internal Revenue Code of 1934, as amended in 1969.[1] The answer of the latter also questions the trust's claim to tax-exempt status as a charitable use again because of the discriminatory language employed by the testator barring non-whites from the benefits of the charitable trust created under the terms of his last will and testament.

■ It thus having been made to appear that the issues framed by the pleadings raise an important question of constitutional law, namely whether or not the distribution by petitioner of trust income solely to citizens of Kent County who are of the white race is constitutionally permissible in the light of recent case law on the subject, two amici curiae have been appointed, one to argue for a strict construction of the provisions of the will here in issue and the other to argue that under the relevant facts of this controversy[2], as well as the applicable law, that the type of discriminatory action directed to be made under the terms of the Potter will, being based solely on color, is in violation of the constitutional principle of equal protection of the laws. The latter has filed a motion for judgment on the pleadings which has been supplemented by affidavits and a deposition. Such motion will accordingly be treated as a motion for summary judgment, and this is the opinion of the Court on such motion, in the making of which judgment the Court has taken judicial notice of papers of record in the file of the Benjamin Potter trust as well as the statutory and case law having to do with such trust.

In the third codicil to his will Colonel Benjamin Potter amended item eighteenth of his will by providing in part:

"I give and bequeath that portion of my estate * * * for the use support maintenance and education of the poor white citizens of Kent County generally. The apportionment and distribution thereof to be made in the same manner and under the same restrictions and regulations as are mentioned and written in the 18 Item of my Last Will and Testament to which this present writing is a Codicil concerning the poor white citizens of the Town of Milford and Milford Hundred."

The distributive provisions to which the third codicil refers are found in item eighteenth of Colonel Potter's will wherein it is provided that distribution of trust moneys " * * * is to be made by agents to be appointed by the Orphans Court or the Levy Court of Kent County as may be deemed most proper." Distribution of trust income was thus directed to be placed under the direction of agents to be appointed by one or the other of the named governmental

I. The part of such statute here relevant has to do with a requirement that a charitable trust must not unconstitutionally discriminate in the distribution of trust moneys without forfeiting its tax exempt status.

2. While the amicus who seeks a strict construction of the Potter trust questions whether or not a justiciable controversy exists, I am satisfied that Mrs. Weller's petition falls within the category of a

fiduciary's complaint for instructions, a type of action clearly within this Court's jurisdiction, and does not merely seek an advisory opinion, particularly in light of the fact that a grave constitutional question is raised by Mrs. Weller's petition transcending her discretion. Compare Bank of Delaware v. Buckson (Del.Ch.) 255 A.2d 710, 715, and see Delaware Trust Company v. Blackstone, 32 Del.Ch. 130, 81 A.2d 126.

agencies, subject, however, to the provision, that it be clearly understood that:

" * * * no part of my bequest shall be applied to the use or benefit of any of person or persons residing within the walls of the poor house, but to be distributed amongst only such of the poor who by timely assistance may be kept from being carried to the poor house and becoming subjects thereof * * *."

After the death of Colonel Potter, the trust created under the terms of his will and codicils thereto became the subject matter of several complex legal proceedings. In 1847, the trustees named in the will having declined to serve, a suit was brought by the Attorney General which resulted in a holding by this Court that the trusts contemplated by Colonel Potter constituted a charitable trust in that neither its appointive provisions nor the terms designating persons to be benefited were void for uncertainty, and further that such trust's provisions creating a public charitable trust of indefinite duration did not violate the rule against perpetuities. Considering the provisions which granted power to the Orphans Court or the Levy Court to appoint agents to administer the trust, the Court held that either court might exercise such power and that if neither court exercised such power, then that the Court of Chancery would make the necessary appointments, State v. Griffith, 2 Del.Ch. 392, aff'd 2 Del.Ch. 421.

The Chancellor, having restrained the Potter heirs from seeking to recover the lands in issue, then placed them in trust, and on June 2, 1847 named Charles T. Fleming, trustee. Thereafter, in 1851, the Legislature, concerned with the fact that much of the Potter farm land was of poor quality and its buildings badly maintained, passed an act authorizing Charles T. Fleming and three others as trustees to sell all of the farmlands which had been placed in trust and placed administration of the proceeds of such sale under the jurisdiction of the Chancellor, 10 Del.Laws, Ch. DXXX.

Such law, however, was held to be unconstitutional in Tharp v. Fleming, 1 Houst. 580, which upheld the position of Mr. Fleming who had sought to enjoin the action of the three other statutory trustees named by the Legislature to convert Potter trust realty into cash for investment under the direction of the Chancellor. A later statute of 1873 required the recording of all leases of trust property in the Court of Chancery of Kent County, 14 Del.Laws, Ch. 552, which law remains in force and effect, 25 Del.C. § 157. Other cases concerned with the trust, which are not concerned with the point of constitutional law here in issue but which indicate continuing Court concern with the trust are as follows; Custis v. Adkins, 1 Houst. 382 (a case dealing with the question of interest on various Potter legacies), Fleming v. Collins, 2 Del.Ch. 230 (an action for waste), and State v. Fleming, 3 Del.Ch. 153 and 517 (a case in which a complaint for removal of Mr. Fleming as trustee for neglect of duty was dismissed).

In 1881, Chancellor Saulsbury, having become concerned about the power and authority of the Court of Chancery to order a sale of lands held in the Potter trust, notwithstanding the ruling made in Tharp v. Fleming, supra, sought the opinion of Nathaniel B. Smithers, a member of the Delaware Bar. Mr. Smithers rendered an opinion that the right to order a sale of lands held in trust for charitable uses resided in the Court of Chancery as part of its inherent jurisdiction. This view was adopted by the Chancellor and is reported in 8 Del.Ch. 554. Finally, in 1952 the Supreme Court of Delaware, in a case concerned with the validity of a statute authorizing the sale of lands by the trustees of New Castle Common, adopted a similar view, and the holding in Tharp v. Fleming, supra, was overruled, Trustees of New Castle Common v. Gordy, 33 Del.Ch. 334, 93 A.2d 509.

The agents to administer distribution of trust income, though appointed by this Court, and, in the case of Mrs. Weller, at

times in consultation with the Court concerning which applicants should be granted relief, have never acted as officials or employees of the State. Furthermore such agents have been compensated solely out of trust income. Finally, the State has made no financial contribution to the trust in any way.

However, agents are required to submit annual reports to the Court of Chancery concerning their expenditures of funds, and in February, 1961, this Court caused to be published a brochure which described the purpose and functions of the trust. This brochure made it clear that Potter trust moneys were available for the "poor white citizens of Kent County". Such brochures have since been made available to those with knowledge of the financial needs of the poor white citizens of Kent County, such as State public welfare, education, and health agents, as well as private welfare, health, and education organizations.

It has accordingly become the practice of various public officials and agents as well as that of private social welfare agencies to refer needy people to the agent of the Potter trust where supplemental or unusual financial help is needed. The present action has arisen as a result of such a referral by the State Department of Public Welfare of a Negro applicant to the trust agent.

■ There is no doubt but that this Court may not instruct the agent to discriminate solely on the basis of race or for any other unconstitutional or unreasonable purpose. See Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161, State v. Brown, Del.Supr., 195 A.2d 379, and Bank of Delaware v. Buckson, supra. It is also obvious that this Court may not practice any form of discrimination in

its own actions. As stated in Bank of Delaware v. Buckson, supra:

"These rulings by the highest courts in our Country and State quite clearly limit this Court in what instructions it may give the Trustee. The short of it is that the Court may not advise the Trustee to reject applications from non-whites because such advice would amount to state (judicial) enforced discrimination in violation of the Fourteenth Amendment."

■ There seems to be no doubt, however, but that as a matter of state trust law, a testator or trustor may cause the creation of a private trust for the benefit of one race just so long as the state does not become so involved in the affairs of such a legal entity as to run afoul of the constitutional guarantees of the equal protection clause of the Fourteenth Amendment to the Constitution of the United States.[3]

Thus, in Evans v. Newton 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373, a case in which a testator devised land to the City of Macon, Georgia, with specific directions, based on philosophical and sociological beliefs, that such lands should never be open to Negroes, the substitution of non-governmental trustees for the City did not immunize the project from constitutionally interdicted governmental involvement and action. Speaking for the court majority, Justice Douglas held:

" * * * Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action. The action of a city in serving as trustee of property under a private will serving the segregated cause is an obvious example. See Com. of Pennsylvania v. Board of Directors of City Trusts, su-

---

3. "No State shall make or enforce any law which shall * * * deny to any person within its jurisdiction the equal protection of the laws."

pra [353 U.S. 230, 77 S.Ct. 806, 1 L.Ed. 2d 792].

" * * * The momentum it (the park in issue) acquired as a public facility is certainly not dissipated ipso facto by the appointment of 'private' trustees. So far as this record shows, there has been no change in municipal maintenance and concern over this facility. Whether these public characteristics will in time be dissipated is wholly conjectural. If the municipality remains entwined in the management or control of the park, it remains subject to the restraints of the Fourteenth Amendment * * * ".

In the cited case, a finding of involvement on the part of the City was based on the theory that the park in question continued to be maintained by the municipality after private trustees had been installed. In the case at bar, on the other hand, there has been no significant change in trust management, the Court of Chancery having been inextricably concerned with the affairs of the Potter trust since before 1850.

As noted earlier, the will itself, executed in 1839, contained provisions providing for a sale of trust property and the Chancellor of the State of Delaware was named as one of the parties authorized and directed to sell the testator's residuary real estate and to reinvest the proceeds. The original trustee and all succeeding trustees as well as agents have been appointed by the Chancellor. As noted above, two special statutes were passed by the Legislature between 1850 and 1875, the first[4] authorized the Court of Chancery to sell trust lands, and the second[5] required the recording of trust property leases. Finally, the authority of the Chancellor to order the sale of trust properties was established in 1952 by the opinion of the Supreme Court of Delaware in the case of Trustees of New Castle Common v. Gordy, supra,

and as a result some of the Potter lands were sold under order of the Court of Chancery.

There is no doubt but that it is firmly established at common law that a testator may, within reason and good morals, devise and bequeath his estate as he sees fit, Girard College Trusteeship, 391 Pa. 434, 138 A.2d 844, cert. denied, sub nomine, Commonwealth of Pennsylvania v. Board of Directors of City Trusts, 357 U.S. 570, 78 S.Ct. 1383, 2 L.Ed.2d 1546. This principle is, of course, subject to laws having to do with descent and distribution and the rule against perpetuities. Next, it would appear to be clear that the Fourteenth Amendment does not apply to purely private trusts. As stated by Mr. Justice Douglas in Evans v. Newton, supra:

"If a testator wanted to leave a school or center for the use of one race only and in no way implicated the State in the supervision, control, or management of that facility, we assume arguendo that no constitutional difficulty would be encountered."

Furthermore, had the trustees named in Colonel Potter's will actually served as such or had a corporate trustee been named so that the function of the Chancellor had become relegated to purely administrative acts, such as the appointment of successor trustees when required so as to ensure continuance of trust purposes and approval of trustee accounts, as is the case in ordinary, private testamentary trusts, such conduct might well be deemed non-state involvement, although in the will of 1839 here in issue the testator directed that distribution of trust income to poor white citizens was to be made not by trustees but by agents appointed by the Orphans Court or the Levy Court of Kent County. And the fact that such agents from the beginning were appointed by

4. 10 Laws of Delaware, Ch. DXXX.

5. 14 Laws of Delaware, Ch. 552.

the Chancellor [6] rather than by either of the governmental agencies named in the will does not alter the fact that extraordinary state involvement in the Potter trust has existed ab initio.

The first question to be answered therefor is whether such involvement has been such as to call into play the provisions of the Fourteenth Amendment, the adoption of the precise terms of which Colonel Potter could hardly have anticipated in 1839 or 1843 when his will and third codicil respectively were executed.

A secondary question is that of whether or not Colonel Potter's testamentary instructions are of such precision and emphasis that to permit trust income to be applied other than to the needs of nonwhite citizens of Kent County would, in the event the Fourteenth Amendment applies, frustrate Colonel Potter's charitable intention to such an extent that the trust must fail.

■ Colonel Potter's will was executed in 1839. It bequeathed a third of the income arising out of the residue of his estate then consisting of real estate, devised in trust, for the benefit of the "poor white citizens of the Town of Milford and Milford Hundred * * *". In 1839, in a first codicil to his will he directed the manumission of a Negro slave in his possession when she should attain the age of twenty one years. This direction puts into perspective his charitable intentions viewed in the light of the testator's awareness of the then long established institution of slavery and the unique status of those held in bondage. Finally, in a third codicil to his will of 1843, reverting to his charitable intention, Colonel Potter enlarged his gift for poor white citizens to include his entire residuary estate and

all of Kent County. These two references and three uses of the words white citizens constitute the testator's only testamentary reference to citizens of such color. Nowhere in the will or codicils thereto is found language which indicates any racial bias, which is readily understandable considering that the care of Negroes in general was the responsibility of their masters at the time the documents in question were executed, and a will must be viewed in the light of conditions existing at the time of its execution.[7] See also Bank of Delaware v. Buckson, supra, and compare Evans v. Newton, supra, and Evans v. Abney, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634, cases which are concerned with the unambiguous desires of the late Senator Bacon of Georgia, whose will was written many years after enactment of the Fourteenth Amendment. In his will he directed that parkland placed in trust by him should be held for:

> "* * * the sole, perpetual, and unending, use, benefit and employment of the white women, white girls, white boys and white children of the City of Macon * * * the said property under no circumstances * * * (is) to be * * * at any time for any reason devoted to any other purpose or use excepting so far as herein specifically authorized."

Since the Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835, it has been established that private conduct abridging individual rights does no violence to the equal protection clause of the Fourteenth Amendment. However, it has been held that:

> "* * * Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance. * * *". Burton v. Wilming-

---

6. As noted above, the Chancellor has also appointed all of the trustees of the Potter trust: See the Potter Charity Trust brochure, February 6, 1961, and Potter trust cases, supra.

7. See act concerning certain crimes and offenses committed by slaves and for the security of slaves properly demeaning themselves. Crimes and Misdemeanors, Laws of Delaware 1829 (Revised Edition), p. 149.

ton Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 860, 6 L.Ed.2d 45.

Next, it was established by Ex parte Virginia, 100 U.S. 339, 25 L.Ed. 676.

"A State acts by its legislative, its executive, or its judicial authorities. It can act in no other way."

In the case of Pennsylvania v. Brown (CA 3) 392 F.2d 120, 123, it was noted after the Orphans Court had replaced the Board of Directors of City Trusts by private trustees that:

"The ironic result of the removal of the City Trustees is that Pennsylvania's involvement with Girard College is far more powerful than was provided for by Mr. Girard. The Commonwealth's Orphans' Court, through its assumed power of appointment and reappointment of the Trustees, is significantly concerned with the current administration of the college."

■ From what I have been able to distill from the federal cases having to do with the impact of the Fourteenth Amendment in discriminatory charitable trust provisions is that in each case involving a trust of a charitable nature, the trust itself must be insulated from governmental action, except for judicial supervision of a routine nature, in order to put it in the category of a non-public institution. See Guillory v. Administrators of Tulane University (D.C.E.D.La.) 212 F.Supp. 674.[8] However, I do not think that such a situation exists in the case at bar.

In addition to the aspects of governmental action above alluded to, it is a matter of record that the present trustee, Farmers Bank, which was appointed to succeed former State Senator James H. Latchum on August 1, 1962, is peculiarly involved with the State. Forty-nine percent of the outstanding shares of stock of Farmers Bank is owned by the State,

and the State is entitled to elect one third of the directors of such corporation, 5 Del.C. § 930. Such directors are required to report annually to the Governor. On their failure to report, they forfeit their offices, 5 Del.C. § 929. Vacancies on the board are filled by the Governor, 5 Del. C. § 930. And other provisions of the Laws of Delaware link the Farmers Bank to State administrative action.

In June, 1957, for the purpose of making the administration of the Potter trust more systematic in its purpose to serve "* * * to and for the support, maintenance and education of the poor white citizens of Kent County generally * * *", a new agent, namely the Potter Charity Administrative Trust Committee was appointed by the Chancellor. This committee evidently did not function efficiently, and on October 19, 1959, Mrs. Weller, the present agent, was appointed. Applications for financial aid are channelled to Mrs. Weller, from State agencies such as the Department of Public Welfare, the State Board of Health, the Mental Hygiene Clinic as well as personnel of the public school system, including school nurses. On one occasion, Mrs. Weller consulted the Court on the question as to whether or not a Puerto Rican could be considered for Potter trust benefits. Having been informed that the applicant in question resided in the black community, the Court advised Mrs. Weller not to accept such application.

Since the sale of certain Benjamin Potter lands was authorized, the sum of $5,000 is deposited each quarter in Mrs. Weller's account by Farmers Bank, trustee, on order of the Chancellor. A typical Court order of January 8, 1965 provides that such amount "be distributed * *' * from time to time as may be necessary among the poor white people of Kent County for the purposes mentioned in the Will of the said Benjamin Potter."

8. The cited case appears not to have been appealed. I find it hard to reconcile it with the leading cases on state involvement.

I conclude that State action subject to the strictures of the Fourteenth Amendment has been here established and that not only may this Court not seek to take a position of neutrality towards Mrs. Weller's petition, but that it must affirmatively instruct her that in arriving at her choices of persons who are, in her opinion, qualified to receive distributions of Potter trust income, no regard be paid by her to the color of any applicant's skin, including that of the applicant whose request led to Mrs. Weller's present petition for instructions.

■ In short, a reading of the cases of Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161, Brown v. Board of Education, 365 U.S. 715, Evans v. Abney 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 and Pennsylvania v. Brown (CA 3) 392 F. 2d 120, cert. denied, 391 U.S. 921, 88 S.Ct. 1811, 20 L.Ed.2d 657, persuades me that the involvement of the Court of Chancery in the supervision and direction of the administration of the charitable trust set up under the will of Benjamin Potter is of such an established and pervading nature that such involvement constitutes that type of governmental entwinement with the affairs of a charitable trust which calls into play the protection of the Fourteenth Amendment.

■ However, because I am of the opinion that the intent of Benjamin Potter to aid the poor citizens of his county, as directed in his will and codicils thereto, was paramount and that it would frustrate his intent to find that the trust created under his last will and testament has failed, the doctrines of cy pres and deviation will be applied to give force and effect to his paramount intention, particularly in light of the fact Negroes became citizens following Colonel Potter's death. This conclusion is given support by the fact that the taxing authorities of both the State and federal government [9] take the position that

unless the trust instrument is reformed so as to make it non-discriminatory as to color of skin and the income of the Potter Trust then distributed as otherwise directed by Colonel Potter, that forfeiture of the tax-exempt status previously accorded such trust will be required.

As noted by the Chancellor in Bank of Delaware v. Buckson, supra, the doctrines of cy pres and deviation overlap to some extent. Delaware has adopted the definition of cy pres set out in the Restatement of the Law, Trusts, § 399, which was quoted in the case of First National Bank & Trust Co. v. First National Bank & Trust Co., 35 Del.Ch. 449, 121 A.2d 296.

"If property is given in trust to be applied to a particular charitable purpose, and it is or becomes impossible or impracticable or illegal to carry out the particular purpose, and if the settlor manifested a more general intention to devote the property to charitable purposes, the trust will not fail but the Court will direct the application of the property to some charitable purpose which falls within the general charitable intention of the settler."

The motion of the amicus curiae for judgment on the pleadings, considered as a motion for summary judgment, will be granted.

On notice, an order will be entered striking the word white from the provisions of the will and codicil of Benjamin Potter which have to do with his charitable trust here in issue, and further reforming said trust instrument as proposed in the form attached to the answer of Farmers Bank, trustee, so as fully to qualify the Potter Trust as a tax-exempt institution. It follows that the plaintiff Mrs. Weller will be directed to continue otherwise to comply with Colonel Potter's instructions as set forth in his last will and testament.

9. Green v. Kennedy (DDC) 309 F.Supp. 1127.