797 A.2d 746

## HOME FOR INCURABLES OF BALTIMORE CITY et al.

v.

## UNIVERSITY OF MARYLAND MEDICAL SYSTEM CORPORATION.

**No. 132, Sept. Term, 1999.**

Court of Appeals of Maryland.

May 6, 2002.

Reconsideration Denied June 6, 2002.

John F. Morkan, III (John C. Baldwin, Geoffrey W. Washington of Ober, Kaler, Grimes & Shriver, on brief), Baltimore; Melvin J. Sykes, Baltimore, argued for appellants.

Shale D. Stiller (Kurt J. Fisher, Evelyn W. Pasquier, William L. Reynolds of Piper, Marbury, Rudnick & Wolfe, LLP, on brief), Baltimore, for appellee.

Deborah M. Thompson, Jonathan M. Smith, Public Justice Center, Baltimore; Stephen H. Sachs, Wilmer, Cutler & Pickering, Baltimore, of counsel, on brief of amicus curiae Public Justice Center on behalf of appellants.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY,* RAKER, WILNER, CATHELL, and HARRELL, JJ.

ELDRIDGE, Judge.

 The controversy in this case concerns a paragraph in a will which makes a charitable bequest to a private nonprofit hospital known as the "Home for Incurables of Baltimore City" or the "Keswick Home." The purpose of the bequest, as stated in the will, was for the Keswick Home to construct a new building for "white patients who need physical rehabilitation." The racially discriminatory "white" patient limitation on the use of the building is clearly illegal.[1] The will further provides that if the bequest is "not acceptable to the Keswick Home, then this bequest shall go to the University of Maryland Hospital to be used for physical rehabilitation." The University of Maryland Hospital is part of the University of Maryland Medical System Corporation.[2]

The Keswick Home will not and cannot comply with the racially discriminatory condition, but otherwise the bequest is fully acceptable to the Home. The alternative disposition to the University of Maryland Hospital does not contain the unlawful racially discriminatory condition.

The broad question before us is whether, under Maryland law, a court will enforce the illegal racially discriminatory

---

* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Among other legal provisions, Maryland Code (1982, 2000 Repl.Vol.), § 19–355 of the Health General Article, flatly states: "A hospital or related institution may not discriminate in providing personal care for an individual because of the race, color, or national origin of the individual."

2. We shall in this opinion sometimes refer to the Home for the Incurables of Baltimore City, or the Keswick Home, simply as "Keswick" or the "Home." Similarly, we shall sometimes refer to the University of Maryland Medical System Corporation as "University Hospital" or the "University."

condition by ordering that the proceeds be paid to the alternative beneficiary, the University of Maryland Hospital. Our answer to this question shall be "No." Instead, the provisions of the will should be applied without giving any effect to the word "white."

## I.

In the trial court, both the appellant Keswick and the appellee University Hospital filed motions for summary judgment based upon a stipulation of facts as well as numerous other documents. The trial court disposed of the case by granting the University's motion for summary judgment. Consequently, we shall set forth the facts in the light most favorable to Keswick. *Lovelace v. Anderson*, 366 Md. 690, 695, 785 A.2d 726, 728-729 (2001), and cases there cited. Nevertheless, there do not appear to be any disputed factual issues which are material to our decision in this case.

Dr. Jesse C. Coggins executed six wills, with multiple codicils, over the course of his lifetime. Beginning with his original will prepared in January 1944, and in every will thereafter, Dr. Coggins left the residue of his estate in trust and provided that, upon termination of the trust, the corpus was to be distributed to the "Keswick Home, formerly Home for Incurables of Baltimore City, with the request that said Home use the estate and property thus passing to it for the acquisition or construction of a new building to provide additional housing accommodations to be known as the 'Coggins Building....'" Throughout the years, Dr. Coggins and his wife were closely associated with the Keswick Home. Thus, Dr. Coggins operated the Laurel Sanitarium from which he regularly transferred patients to Keswick because of its rehabilitative capabilities. Mrs. Coggins became a nurse at the Sanitarium in 1940, and she and her husband continued to operate the sanitarium for the next 23 years. Mrs. Coggins served actively on Keswick's Board of Directors, and, toward the end of her life, Mrs. Coggins was a resident in Keswick's integrated Coggins Building. According to a memorandum by the Trustee, Mercantile Safe Deposit & Trust Company, in

1986 Mrs. Coggins requested that the Trustee change some of the securities in the trust, "despite the fact that her ... income would decline...." The memorandum stated that "[h]er feeling is that her personal assets are also pledged to Keswick and that this gesture will enlarge the ultimate gifts which Keswick will receive."

Dr. Coggins died on January 21, 1963. In his last will, dated December 27, 1962, after making a bequest of tangible personal property and a number of other bequests, Dr. Coggins gave the residue of his estate to the Mercantile Safe Deposit & Trust Company ("Mercantile") to be held by it as Trustee under "ITEM 5" of the will. The trust provided for monthly payments to four income beneficiaries until the death of the last of them. The last of these annuitants was Dr. Coggins's widow who died on September 10, 1998.

Paragraph (f) of ITEM 5 of the will stated that, upon the death of the survivor of the four annuitants,

"the trust shall terminate and the assets thereof as then constituted together with all unpaid income shall be paid over free of trust unto the KESWICK HOME, formerly Home for Incurables of Baltimore City, with the request that said Home use the estate and property thus passing to it for the acquisition or construction of a new building to provide additional housing accommodations to be known as the 'Coggins Building,' to house white patients who need physical rehabilitation. If not acceptable to the Keswick Home, then this bequest shall go to the University of Maryland Hospital to be used for physical rehabilitation."

The clause "to house white patients who need physical rehabilitation," and the alternative gift over to University Hospital, appeared for the first time in Dr. Coggins's final will executed less than one month before his death.

On February 7, 1963, about two weeks after Dr. Coggins's death, John T. Kenny, Vice President of Mercantile, provided a copy of the will to Keswick and stated in an accompanying letter:

"On the death of the last survivor of the four annuitants, the trust terminates, and the estate passes free of trust to the Keswick Home as directed in Item 5(f) of the Will."

In 1964, Keswick's Board of Directors began to discuss a plan, prepared by Keswick's "New Building Committee," for the construction of a new building. Keswick's Board of Directors in 1969 designated the new building that was to be constructed as the "Coggins" building, "in honor of the late Dr. Jesse C. Coggins and in appreciation of his great generosity to 'Keswick.' " Construction of the building began in 1970 and was financed by a loan from Mercantile, gifts, and a grant under the federal Hill Burton Act, 42 U.S.C. § 291 *et seq.* Construction was completed in 1974, and the building was dedicated as the "Coggins Building" in 1975.

During the next twenty years, Keswick made renovations and constructed a major addition to the Coggins Building. These were paid for by donations and bank loans. As of the date the trust terminated, Keswick had expended nearly $11 million in construction costs and capitalized repairs for the Coggins Building, which was being used to house approximately 160 residents, all of whom were or had been receiving physical rehabilitation services. After operating the Coggins building for many years, Keswick presented Mercantile with future plans that outlined a program for the expenditure of an additional $15.5 million, to be taken from the Coggins Trust, in construction costs for more additions and renovations to the Coggins Building.

Upon the death of Mrs. Coggins in September 1998, a Mercantile memorandum stated:

"The last beneficiary of this trust died recently. Therefore, the trust now terminates and the balance transfers to Keswick Home. According to the will, the money is for construction of the Coggins Building. Keswick actually built the Coggins Building with their own money ($10 million) ... because they needed the building at that time and because we agreed to reimburse them from the trust when it terminated."

Nevertheless, Mercantile did not turn over the trust proceeds to Keswick. Instead, in 1999 Mercantile filed the present interpleader action pursuant to Maryland Rule 2–221, asserting that, depending upon the will's construction, the trust assets were to be "distribut[ed] to one of two ... named, competing, and alternative beneficiaries." Mercantile stated that, in order to fulfill its obligation to distribute the trust assets properly, and being concerned that an improper distribution might subject Mercantile to liability, an order of interpleader was necessary.

The Circuit Court for Baltimore City entered an order of interpleader whereby Keswick was designated as the plaintiff and University Hospital was designated as the defendant. As earlier mentioned, both parties filed motions for summary judgment, and the case was presented to the Circuit Court on a stipulation of facts and several documents.

Keswick argued that Dr. Coggins did not intend the racial restriction to be a binding condition for Keswick to receive the bequest, and that he did not intend for the gift to fail if it became legally impossible for Keswick to comply with the racial restriction. Keswick also argued that it had "accepted" the bequest within the meaning of the will's language. In addition, Keswick contended that, as a matter of public policy and Maryland law, the illegal racial restriction should be excised. Keswick maintained that Maryland law does not "present Keswick with a Hobson's choice: either violate the law or forfeit a bequest that would significantly assist Keswick in pursuing its charitable endeavors." Keswick also relied upon the federal Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982, upon the Fourteenth Amendment, upon the Maryland Constitution, upon Maryland anti-discrimination statutes, and upon Maryland cases declining to enforce conditions in wills which are impossible to perform, illegal, or contrary to public policy. *See, e.g., Keyser v. Calvary Brethren Church*, 192 Md. 520, 524–525, 64 A.2d 748, 749–750 (1949); *Fleishman v. Bregel*, 174 Md. 87, 96–100, 197 A. 593, 597–599 (1938); *Ellicott v. Ellicott*, 90 Md. 321, 331–333, 45 A. 183, 187–188

(1900); *Martin v. Young,* 55 Md.App. 401, 404–408, 462 A.2d 77, 78–81, *cert. denied,* 297 Md. 418 (1983).

University Hospital argued that the controlling factor in the case was Dr. Coggins's intention and that, based on the language of the will as well as the surrounding circumstances, it was clear that Dr. Coggins intended for the Coggins building to "house only white patients." University Hospital argued that, if Keswick would not comply with this racial restriction, Dr. Coggins clearly intended that the trust pass to the alternative beneficiary, University Hospital. University Hospital further contended "that the racial restriction" was not "so heinous that it should simply be read out of the will," and that the cases under the Fourteenth Amendment's Equal Protection Clause did not require that the racial restriction " 'be treated as absolutely void.' " University Hospital claimed that judicial enforcement of the racially discriminatory restriction would not constitute state action in violation · of equal protection principles. University Hospital maintained that, because the will involved a charitable bequest, the issue was controlled by the *cy pres* doctrine under state law. Moreover, according to University Hospital, the *cy pres* doctrine would not permit the striking of the illegal racial restriction because of the presence of the gift over to an alternative beneficiary. University Hospital argued that cases striking out illegal or impossible conditions in non-charitable trusts, such as *Fleishman v. Bregel, supra,* 174 Md. 87, 197 A. 593, were inapplicable to charitable trusts because the latter were controlled by the Maryland Uniform Charitable Trusts Administration Act, known as the *cy pres* statute, Code (1974, 2001 Repl.Vol.), § 14–302 of the Estates and Trusts Article. University Hospital's position was that, even though it would be "illegal for Keswick to accept the bequest on Dr. Coggins' terms," nevertheless "the principle of freedom of testation entitled Dr. Coggins to impose the racial condition. . . . "

The Circuit Court filed a written opinion which essentially adopted the arguments by University Hospital. The court entered a judgment granting University Hospital's motion for summary judgment and ordering "that the proceeds of the

bequest in question, ... in the amount of $28,834,000.00, plus any additional interest earned minus costs of the proceeding shall be paid to University of Maryland Medical System Corporation." Keswick appealed, and this Court issued a writ of certiorari prior to any proceedings in the Court of Special Appeals. *Home for Incurables v. University of Maryland Medical System,* 357 Md. 233, 743 A.2d 245 (2000).

## II.

The issues raised and the arguments made by the parties in this Court are basically the same as those advanced in the Circuit Court. We find it unnecessary, however, to address every argument made by the parties. Instead, we shall assume, *arguendo,* that Dr. Coggins intended the racial restriction to be a condition for Keswick to have the bequest, that Keswick's inability to comply with the illegal condition means that Keswick has not "accepted" the gift within the meaning of the will, and that judicial enforcement of the racially discriminatory condition, by awarding the proceeds to University Hospital, will not violate the United States Constitution, federal statutes, or the Maryland Constitution. Nonetheless, we shall hold that, under our cases dealing with illegal conditions in wills as well as the *cy pres* doctrine, the bequest should be awarded to Keswick.

This Court has long held that where a bequest is conditioned upon the commission of an illegal act or an act which is legally impossible of fulfillment, the condition is invalid on the ground of public policy. Under these circumstances, the condition will not be enforced by awarding the bequest to an alternative beneficiary; instead, the illegal condition will be excised.

Thus, in *Fleishman v. Bregel, supra,* 174 Md. 87, 197 A. 593, the testator left her estate in trust, with directions that the trustee pay one-half of the net income to her older son William and one-half of the net income to her younger son Calvin. The will further provided that, when the younger son reached the age of 30, at which time, "if William ... shall be no longer

married to his present wife," the trust would terminate and the corpus would become the property of both sons "equally, as tenants in common." If, however, when Calvin became 30, William "shall be living with his present wife," the trust would continue as to him. He would receive a share of the income but would never receive any of the corpus which would pass under an alternative disposition. After the testator's death, William brought a declaratory judgment action challenging the viability of the condition that he divorce or cease living with his wife. In holding that the condition was unenforceable, and that William was entitled to one-half of the corpus of the trust upon Calvin's reaching the age of 30, this Court initially stated (174 Md. at 99, 197 A. at 598):

"But under the conditions of that item, he must divorce his wife or in any event cease to live with her in order to have the corpus. He is thus afforded a financial reward for securing a divorce or ceasing to live with his wife. Since he has no valid reason for not living with her, he can secure a divorce only through fraud or collusion, and in either case the conditions which induce him to take such action for reward are against public policy. To enforce them by compliance would tend to disrupt appellant's family relations, and it is inconceivable that a more improper motive for terminating such relations could be held out to him than by the provisions in question."

The Court then concluded (174 Md. at 99–100, 197 A. at 598–599):

"[T]he conditions of that item relating to appellant's marital status, both in regard to no longer living with his wife and with reference to securing a divorce from her, are void as against public policy, and ... the bequest is consequently unaffected by such conditions. These conclusions concerning those conditions are in no way affected by the expression used by testatrix in the second paragraph of that item requiring their performance by the time of her decease, for since during the twenty-three days which elapsed between the date of executing the will and death of testatrix there existed no cause entitling appellant to a divorce from his

wife, it must be assumed that he could not have procured one. That requirement must, therefore, be regarded as impossible of fulfillment."

The principle applied in *Fleishman v. Bregel* has also been applied by this Court to charitable bequests. In *Keyser v. Calvary Brethren Church, supra,* 192 Md. at 522, 64 A.2d at 748, the testator left a sum of money to the Calvary Brethren Church "for the building of a Church to be held in trust for five years[;] if they do not build within five years then this returns to my estate." The testator died on May 14, 1942. The United States Government had restricted the use of building materials on April 9, 1942, because of the Second World War, and did not lift the restrictions until June 1947. In July 1947, more than five years from the testator's death, the Church began construction of the building. The executor and the residuary legatees appealed from a trial court order directing distribution of the bequest to the Calvary Brethren Church, relying on the noncompliance with the condition that the building be constructed within five years. Viewing the five-year building requirement as a "condition subsequent," this Court affirmed the decree on two grounds. The Court expressed the view that "[w]e cannot suppose that the testatrix intended that such a condition should defeat her express desire that the appellee build a church. It started to build such a church as soon as it could, and has now constructed one. . . ." 192 Md. at 524, 64 A.2d at 749. Alternatively, the Court pointed out that the federal law restrictions made the condition legally impossible to comply with, and that " '[a] condition which is legally impossible of performance without violation of law may ordinarily be regarded as invalid by reason of illegality rather than of impossibility.' " 192 Md. at 524–525, 64 A.2d at 750. The Court then summarized (192 Md. at 525, 64 A.2d at 750):

"We conclude that, from either of these points of view, the church is relieved from compliance with the condition subsequent. The testatrix could not have intended to require performance in the contingency that arose, and the church could not have performed without a violation of law. In-

deed, it may be doubted if it could have performed at all, because, had it attempted to proceed without a permit, and had it been able to get the materials needed without priorities, the construction undoubtedly would have been promptly stopped by action of the authorities."

In addition to the *Fleishman* and *Keyser* opinions, *see, e.g., Loats Asylum v. Essom,* 220 Md. 11, 22, 150 A.2d 742, 748 (1959) (reiterating the holding of the *Keyser* case); *Ellicott v. Ellicott, supra,* 90 Md. at 331–332, 45 A. at 187 ("The performance [of the condition] becoming impossible ..., it is dispensed with and the estate vested absolutely"); *Hammond v. Hammond,* 55 Md. 575, 582–583 (1881) ("the condition annexed to this bequest is ... so clearly posterior to the vesting of the legacy, that we have no difficulty in declaring it a condition subsequent, and its performance becoming impossible ..., the legatee takes unconditionally"); *Martin v. Young, supra,* 55 Md.App. at 406–407, 462 A.2d at 80 ("For centuries courts have recognized that impossibility of performance may modify the legal effect of the breach of a condition in a will. * * * The appellees herein insist that we follow the rule ... that, before a devise of real property made upon a condition precedent could take effect, the condition had to be performed even though performance was rendered impossible through no fault of the devisee. We decline to do so").[3]

---

**3.** The *Keyser, Ellicott,* and *Hammond* opinions in this Court distinguished between "conditions precedent" and "conditions subsequent" attached to bequests. The Court in *Keyser,* 192 Md. at 523–524, 64 A.2d at 749, pointed out that "if a gift is first given and then a condition is added by later words, such condition is generally held to be" a condition subsequent, "that the law favors the early vesting of estates," and that when a " 'condition subsequent becomes impossible, the general rule is that an estate granted upon such condition becomes absolute,' " quoting *Page On Wills,* Vol. 3, § 1284, p. 762. The cases in this Court which have discussed "conditions precedent" and "conditions subsequent" in the context of wills and of illegal conditions or conditions which are impossible of performance, have all categorized them as "conditions subsequent" and have refused to enforce them. The opinion in *Fleishman v. Bregel* did not discuss the illegal condition there involved as a "condition precedent" or "condition subsequent," although commentators have treated it as a condition precedent. *See,*

University Hospital distinguishes *Fleishman v. Bregel, supra,* 174 Md. 87, 197 A. 593, on the ground that *Fleishman* did not involve a charitable trust. University argues that the principle regarding illegal conditions in bequests, applied in *Fleishman,* has no application to charitable trust bequests, and that illegal conditions attached to charitable trust bequests are governed entirely by the *cy pres* doctrine, embodied in the Maryland Uniform Charitable Trusts Administration Act, otherwise know as the *cy pres* statute, Code (1974, 2001 Repl.Vol.), § 14–302 of the Estates and Trusts Article.[1]

---

*e.g.,* IA Scott and Fratcher, *Scott on Trusts,* § 65.3 at 382–383 (4th ed.1987).

The trial court's opinion in the present case stated that the "arguments presented regarding conditions subsequent and conditions precedent ... are not pertinent to the outcome of this case and are therefore not discussed in this memorandum opinion." In this Court, Keswick argues that the illegal racial condition in Dr. Coggins's will should be excised "whether it is construed as a condition subsequent or precedent" (appellant's brief at 23), although Keswick argues that it is a condition subsequent. University Hospital argues that the result in this case should not depend upon whether the condition is categorized as "precedent" or "subsequent," and it views the distinction as obsolete. University asserts, however, that "[i]f the Court were to resurrect the distinction," the condition is "a condition precedent." (Appellee's brief at 65, n. 41).

In our view, the illegal racial condition in Dr. Coggins's will should be excised regardless of the distinction between conditions precedent and conditions subsequent. Consequently, we need not and shall not consider whether the distinction, as applied to bequests, has any viability today.

**4.** Section 14–302 provides as follows:

" **§ 14–302. Uniform Charitable Trusts Administration Act.**

(a) *General rule.*—If a trust for charity is or becomes illegal, or impossible or impracticable of enforcement or if a devise or bequest for charity, at the time it was intended to become effective, is illegal, or impossible or impracticable of enforcement, and if the settlor or testator manifested a general intention to devote the property to charity, a court of equity, on application of any trustee, or any interested person, or the Attorney General of the State, may order an administration of the trust, devise or bequest as nearly as possible to fulfill the general charitable intention of the settlor or testator.

(b) *Uniformity of construction.*—This section shall be interpreted and construed to effectuate its general purpose to make uniform the law of those states which enact it.

University Hospital asserts that "the Maryland *cy pres* statute controls this case." (Appellee's brief at 33). University also argues that *Keyser v. Calvary Brethren Church, supra,* 192 Md. 520, 64 A.2d 748, although involving a charitable bequest, is similarly distinguishable because the will in that case was written prior to the adoption of the *cy pres* statute, and that, under Maryland cases, the *cy pres* statute has no application to wills written prior to its enactment. *See Fletcher v. Safe Deposit and Trust Co.,* 193 Md. 400, 410, 420, 67 A.2d 386, 390, 395 (1949) (although stating that "the *cy pres* statute . . . [is] not applicable retroactively," the Court later observed that "[p]erhaps without resort to any *cy pres* doctrine, the same result might be reached by a 'liberal construction' of the will"). *See also Loats Asylum v. Essom, supra,* 220 Md. at 22, 150 A.2d at 748 (to the same effect).[5]

■ The *cy pres* statute directs a Maryland court to salvage a bequest for charity and administer the bequest as nearly as possible in accordance with the testator's intent if, at the time it becomes effective, the bequest "is illegal, or impossible or impracticable of enforcement," as long as "the settlor . or testator manifested a general intention to devote the property to charity . . . ." § 14–302(a) of the Estates and Trust Article.

(c) *Short title.*—This section may be cited as the Maryland Uniform Charitable Trust Administration Act."

5. University Hospital also distinguishes *Keyser v. Calvary Brethren Church* on the basis of this Court's conclusion in the *Keyser* opinion that "[w]e cannot suppose that the testatrix intended that such a condition should defeat her express desire that the appellee build a church." 192 Md. at 524, 64 A.2d at 749. As previously discussed, however, this was an alternative reason set forth in the *Keyser* opinion. Moreover, the statement was not based upon any extrinsic evidence, but was an inference drawn by this Court from the will itself. The same could be said about Dr. Coggins's last will. In December 1962, when the will was drawn, Dr. Coggins or the scrivener were undoubtedly aware that a publicly owned and operated hospital, like University, could not legally discriminate on the basis of race or color, and thus the racially discriminatory condition was not part of the gift over. Presumably, if Dr. Coggins had known that it would in the future become a violation of Maryland statutes for a private hospital to discriminate based on race or color, he would not have attached the racially discriminatory condition to the primary bequest to Keswick.

Seizing upon the statutory language that the testator have a *general intention* to devote the property to charity, University Hospital contends that, in light of the gift over to the alternative beneficiary, Dr. Coggins did not have such a general charitable intent. University Hospital, citing some cases from other states, argues for an absolute rule

"that a 'general charitable intention' is not present where a testator has expressly provided a 'gift over' in the event that the initial charitable bequest fails for illegality, impossibility, or any other reason. See Bogert, The Law of Trusts and Trustees § 437 (rev.2d ed.1991); *Connecticut Bank and Trust Co. v. Johnson Memorial Hospital, supra,* [30 Conn. Supp. 1, 294 A.2d 586 (1972)]...." (Appellee's brief at 34–35).

Furthermore, University's argument continues, there is no legal "support for Keswick's argument that a charitable bequest can be reformed or modified on some basis other than *cy pres.*" (*Id.* at 41). As previously mentioned, University maintains that opinions of this Court such as *Fleishman v. Bregel, supra,* and *Keyser v. Calvary Brethren Church, supra,* which would support the excising of an illegal condition attached to a bequest, have no application to charitable bequests in wills written after the enactment of the *cy pres* statute.

Consequently, under University Hospital's theory, the *cy pres* statute, which was intended to save charitable bequests, should be used as a sword to strike down the charitable bequest to Keswick even though, under Maryland law prior to the *cy pres* statute, the bequest to Keswick would not have failed. We decline to adopt University Hospital's construction of the *cy pres* statute. It is not supported by the language of the statute, by the statutory purpose, by reason, or by any Maryland appellate case.

There are a few cases elsewhere which do support University Hospital's position regarding *cy pres* statutes. They hold that, where there is an illegal discriminatory condition attached to a charitable bequest, and a reversionary clause or provision for a gift over if the condition is not complied with,

there is no general charitable intention and the *cy pres* doctrine does not permit a court to save the primary bequest by excising the illegal condition. Instead, under this view, a court should enforce the testator's discriminatory purpose by awarding the bequest to the alternative beneficiary. A leading case to this effect, and the case primarily relied on by University Hospital, is the 1972 opinion of the Superior Court of Connecticut in *Connecticut Bank and Trust Co. v. Johnson Memorial Hospital, supra,* 30 Conn.Supp. 1, 294 A.2d 586. *See also Smyth v. Anderson,* 238 Ga. 343, 348–349, 232 S.E.2d 835, 839 (1977).

Most of the cases relied on by University Hospital, however, do not involve *illegal* conditions attached to charitable bequests; instead, they involve conditions which could not be complied with for other reasons. *See, e.g., Jewish Guild for the Blind v. First National Bank,* 226 So.2d 414 (Fla.App. 1969); *Burr v. Brooks,* 83 Ill.2d 488, 48 Ill.Dec. 200, 416 N.E.2d 231 (1981); *Nelson v. Kring,* 225 Kan. 499, 592 P.2d 438 (1979); *Orphan Society of Lexington v. Board of Education,* 437 S.W.2d 194 (Ky.1969); *City of Belfast v. Goodwill Farm,* 150 Me. 17, 103 A.2d 517 (1954); *The Pennsylvania Company v. Board of Governors of the London Hospital,* 79 R.I. 74, 83 A.2d 881 (1951). *See also,* Wilner, *The Cy Pres Doctrine Explored,* 22 Md. L.Rev. 340, 348 (1962) (citing a Pennsylvania lower court case and an Illinois case for the general proposition "that *cy pres* . . . will not be applied where the trust or will provides for a specific alternate distribution effective on the failure of the primary charitable gift").

On the other hand, the position taken in the Connecticut case has been criticized, and there are decisions to the contrary. As pointed out in IVA Scott and Fratcher, *Scott On Trusts,* § 399.4A (4th ed.1987),

"it has been held that if it is expressly provided by the terms of the trust that if the restriction is illegal the property should go to a different charity, the doctrine of cy pres is not applicable and the gift over takes effect. In *Connecticut Bank & Trust Co. v. Johnson* a testatrix left money in trust to be used in a particular hospital for the

care of patients of the caucasian race. She provided that if the terms of the trust should be illegal or ineffective, the money should go to other designated charities. It was held that the racial restriction was illegal, and that because there was a gift over, the doctrine of cy pres was not applicable.

"On the other hand, it has been held in several cases that where the restriction was illegal, the doctrine of cy pres was applicable, and that the trust should be carried on free of the restriction."

For cases applying the *cy pres* doctrine and declining to invoke the absolute rule advocated by University Hospital, some of which involve wills containing gifts over or reversionary clauses and some of which do not, *see, e.g., Estate of Vanderhoofven,* 18 Cal.App.3d 940, 946–948, 96 Cal.Rptr. 260, 263–265 (1971); *In re Will of Potter,* 275 A.2d 574, 583 (Del.Ch.1970); *Bank of Delaware v. Buckson,* 255 A.2d 710 (Del.Ch.1969); *Trammell v. Elliott,* 230 Ga. 841, 199 S.E.2d 194 (1973); *The Howard Savings Institution v. Peep,* 34 N.J. 494, 170 A.2d 39 (1961); *In the Matter of the Trust of Van Bomel,* 110 Misc.2d 1068, 443 N.Y.S.2d 572 (1981); *In the Matter of Estate of Hawley,* 32 Misc.2d 624, 223 N.Y.S.2d 803 (1961); *In the Matter of Estate of Sterne,* 147 Misc. 59, 263 N.Y.S. 304 (1933); *Wooten v. Fitz Gerald,* 440 S.W.2d 719 (Tex.Civ.App.1969); *United States v. Hughes Memorial Home,* 396 F.Supp. 544, 552–553 (W.D.Va.1975); *Wachovia Bank and Trust Co. v. Buchanan,* 346 F.Supp. 665 (D.D.C. 1972).

■ As previously pointed out, the purpose of the *cy pres* statute was to save some charitable bequests which would have failed under prior law, and not to strike down bequests which would have been saved under cases like *Fleishman v. Bregel, supra,* 174 Md. 87, 197 A. 593, and *Keyser v. Calvary Brethren Church, supra,* 192 Md. 520, 64 A.2d 748. Moreover, nothing in the language of the *cy pres* statute mandates a rule that a court cannot excise an *illegal* condition attached to a charitable bequest whenever the will contains an express gift over or a reversionary clause. Furthermore, where the gift over is also to a charity, it would seem that the testator's

general charitable intent is confirmed. *See Miller v. Mercantile–Safe Deposit and Trust Co.,* 224 Md. 380, 389, 168 A.2d 184, 189 (1961) ("the fact that the testator bequeathed practically all of his estate for charitable purposes, is sound evidence denoting a general charitable intent").

■ As acknowledged by University Hospital (appellee's brief at 35), no Maryland appellate case has held that a charitable bequest with an illegal condition will not be saved under the *cy pres* doctrine when the will contains an express reversionary clause or gift over. The Maryland cases dealing with the *cy pres* doctrine have not involved *illegal* bequests. Rather, they have involved charitable bequests which could not be carried out for other reasons. Even in this situation, however, where the testator's intent is not contrary to law and public policy, the Maryland cases have not adopted the absolute rule contended for by University Hospital. Instead, the presence or absence of a gift over is merely one factor among many in determining whether the testator had a general charitable intent and whether the *cy pres* doctrine should be applied to save the charitable bequest at issue. *Miller v. Mercantile–Safe Deposit and Trust Co., supra,* 224 Md. at 388–390, 168 A.2d at 189 ("[T]here are no hard and fast rules to determine when the intent of the testator is general," and the "absence of a gift over" or reversionary clause is simply "another indication of a general charitable intent"); *Gallaudet University v. DAR,* 117 Md.App. 171, 207–208, 699 A.2d 531, 548–549 (1997).

■ Today in Maryland, there are few if any public policies stronger than the policy against discrimination based on race or color. *See, e.g.,* Code (1957, 1998 Repl.Vol.), Art. 49B, §§ 1–51; Code (1982, 2000 Repl.Vol.), § 19–355 of the Health General Article; Code (1978, 2001 Repl.Vol.), § 13–303(d) of the Education Article (mandating that the University of Maryland Medical System Corporation "shall operate the medical system without discrimination based on race"); *Hernandez v. State,* 357 Md. 204, 218–225, 742 A.2d 952, 959–963 (1999); *Gilchrist v. State,* 340 Md. 606, 620–625, 667 A.2d 876, 882–885

(1995); *Hill v. State,* 339 Md. 275, 280–285, 661 A.2d 1164, 1167–1169 (1995); *Ashton v. Brown,* 339 Md. 70, 98–101, 660 A.2d 447, 461–462 (1995).

We continue to adhere to the holding in *Fleishman v. Bregel, supra,* 174 Md. 87, 197 A. 593, that where a condition attached to a bequest is clearly illegal and violates a strong public policy, the illegal portion of the condition should be excised and the bequest enforced without regard for the illegal condition. Moreover, this principle is consistent with the purpose of the *cy pres* statute, and, therefore, is fully applicable to illegal conditions attached to charitable bequests.

The illegal racially discriminatory condition in Dr. Coggins's will violates Maryland public policy to as great an extent as the illegal condition involved in the *Fleishman* case. Consequently the provisions of the will should be administered as if the word "white" was not contained in the bequest to the Keswick Home.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED, AND THE CASE IS REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEE, UNIVERSITY OF MARYLAND MEDICAL SYSTEM CORPORATION.*